Richard R. RISS, Sr., Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 72–1342.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1973.

Decided April 19, 1973.

James K. Logan, and Edward M. Boyle, Olathe, Kan., for appellant.

Michael L. Paup, Atty., Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before GIBSON and ROSS, Circuit Judges, and BENSON,[*] District Judge.

## GIBSON, Circuit Judge.

This appeal[1] is another episode in the tax difficulties that has engulfed the appellant Richard R. Riss, Sr. and several related corporations that he controlled during the time the tax problems arose. This particular appeal concerns (1) the holding of the Tax Court that the appellant-taxpayer received a dividend of $96,000 in 1958 in consummating a bargain purchase from a controlled corporation, and (2) the disallowance of a bad debt deduction taken in 1963 on appellant's personal income tax and a related issue of a net operating loss carryback from the year 1963 to the year 1960, which turns on the resolution of the bad debt issue.[2]

## CONSTRUCTIVE DIVIDEND ISSUE

We first consider the older of the tax problems originating in the taxpayer's purchase of a 50 per cent stock interest in the Niles and Moser group of corporations and a $215,000 note of that group from Transport Mfg. & Equipment Company (T.M.E.), a corporation controlled by taxpayer. Riss purchased the stock for $150,000 and the note for its face value of $215,000.

The Niles and Moser group was engaged in merchandising cigars. Without repeating the total background of Riss's difficulties in the operation of his controlled trucking company, Riss & Co., and its affiliate T.M.E., utilized for the purpose of purchasing capital equipment for Riss & Co.'s operations, suffice it to say that Riss & Co. enjoyed a high degree of prosperity in the hauling of explosives in the early 1950's, when its operating revenues exceeded $30 million and then entered into a period of precip-

itous decline so that it sustained operating losses from 1956 through the pertinent period of these tax difficulties. Riss & Co.'s problems were compounded by major law suits from suppliers of equipment, state governments seeking fines or sanctions for violating state operating laws, and jeopardy assessments by the United States government of $4.9 million against Riss & Co. and $2.3 million against T.M.E. During this period of travail Riss & Co. and T.M.E., in order to get the jeopardy assessments lifted, agreed with the then District Director of Internal Revenue that T.M.E. would not make any major transfer or sale of its assets without written notice to the Director.

T.M.E. had held since 1955 a 50 per cent stock interest in six corporations, known as Niles and Moser group and engaged in the merchandising of cigars. The total acquisition cost of the Niles and Moser group asset was about $2,700,000, which was financed in part by a 50 per cent stock purchase for $150,000 and $215,000 loan from T.M.E. together with a like loan of $215,000 and 50 per cent stock purchase from R. O. Stenzel & Company. The balance of the $2.7 million was obtained from a commercial lending institution. The loans made by T.M.E. and Stenzel were subordinate to the bank loan.

In 1958 T.M.E. needed $400,000 cash to pay a bank loan. T.M.E. decided to sell some of its non-productive assets, and the 50 per cent stock interest in the Niles and Moser group was sold to appellant Riss at the figure these assets had on T.M.E.'s books, namely $150,000 for the stock and $215,000 for the note. Appellant testified he offered this stock to Mr. Stenzel, the other 50 per cent owner, but he was not interested. The record, however, is silent as to what price was placed on the stock or the

* Judge Benson, Chief Judge of the District Court for the District of North Dakota, sitting by designation.

1. Jurisdiction is pursuant to 26 U.S.C. § 7482(a).

2. The Tax Court decision authored by the Honorable Leo H. Irwin, is reported in 56 T.C. 388 (1971).

stock and note in the offer to Stenzel. Stenzel was the active operator of the business, and under the agreement of purchase with the appellant, Stenzel could control the business as he had the right to name three of the five members of the Board of Directors of the company.

The Niles and Moser group experienced, since its acquisition by T.M.E. and Stenzel in 1955, a successful financial operation, increasing its earned surplus from zero in 1955 to over $446,000 in 1958 and $687,000 in February 1959.[3] No dividends had been paid on this stock because of the large bank debt. The average annual after tax income of the group was also substantial.[4]

The sale to the taxpayer Riss was, after proper notice to the District Director of Revenue, made on September 9, 1958. The District Director interposed no objection to the proposed sale. The taxpayer apparently borrowed money on other assets to make this purchase, and the $365,000 received by T.M.E. was applied to a $400,000 obligation then due to a bank. The remaining $35,000 was paid by way of a 90-day note.

The Commissioner determined that the taxpayer's purchase of the Niles and Moser stock constituted a bargain purchase and treated the difference between $342,000, the amount which the Commissioner determined to be the fair market value of the shares, and the sale price of $150,000, as a dividend distribution to taxpayer. Palmer v. Commissioner, 302 U.S. 63, 69, 58 S.Ct. 67, 82 L.Ed. 50 (1937); Southern Ford Tractor Corp., 29 T.C. 833, 840–841 (1958). The Commissioner arrived at his valuation by multiplying the average annual earnings for the period by the factor of four, in other words, a capitalization of earnings at the rate of 25 per cent. He also arrived at a net worth liquidation valuation in the same amount of $342,000.

In contesting the Commissioner's fair market value, the taxpayer contends that no outside party would have been interested in buying the stock in a closely held corporate group that was managed by the owner of the other 50 per cent interest and subject to the direction of a board of directors controlled by the other owner. Also, adverse to the shares' market value were the sizeable jeopardy income tax assessments and the dependency of the business upon the operating knowledge and skill of the other 50 per cent holder, R. O. Stenzel. Further, the companies were totally dependent upon suppliers who could cancel for any reason upon 90 days notice, and the suppliers required the taxpayer's personal guarantee with every purchase made by the corporate group. Balancing and possibly outweighing the adverse factors were the excellent operating results and the increase in net worth. Obviously the shares in question had appreciably increased in value.

The notice of deficiency for 1958 was issued to the taxpayer on June 29, 1962. Taxpayer filed his petition in

3. The earned surplus account as reflected on the books was as follows:

| Corporation | 5–21–55 | 2–29–56 | 2–28–57 | 2–28–58 | 2–28–59 |
|---|---|---|---|---|---|
| Niles | ——— | $ 62,694 | $139,864 | $210,744 | $322,736 |
| Niles Colorado | ——— | 26,334 | 62,679 | 108,616 | 164,220 |
| Southwest | ——— | 16,721 | 32,939 | 56,956 | 87,114 |
| Stickney | ——— | 9,959 | 3,446 | 8,641 | 22,621 |
| Bannock | ——— | 8,575 | 17,980 | 33,166 | 49,683 |
| Irving | ——— | 7,417 | 17,145 | 27,934 | 40,916 |
| Total | | $131,700 | $274,053 | $446,057 | $687,290 |

4. The total after tax income of the group is reported as follows:

| 5–21–55 to 2–29–56 | Year Ended 2–28–57 | Year Ended 2–28–58 | Year Ended 2–28–59 | 5–21–55 to 2–28–58 | 5–21–55 to 2–28–59 |
|---|---|---|---|---|---|
| $131,700 | $142,353 | $172,004 | $243,233 | $160,580 | $181,910 |

the Tax Court on September 19, 1962, which the Commissioner answered on November 15, 1962. The Commissioner, however, raised the constructive dividend issue for the first time in an amended answer on October 7, 1964. Ordinarily the burden of proof is on the taxpayer to disprove a valuation set by the Commissioner. However, since the Commissioner was late in raising the issue of a constructive dividend, he has the burden of proving that the transaction was in substance a dividend. Riss & Co. v. Commissioner, 56 T.C. 388, 429 (1971); Rule 32, Rules of the United States Tax Court.

The Tax Court did not accept in full the Commissioner's valuation but did find that the Commissioner carried his burden of proof in showing that a constructive dividend had in fact been received in the amount of $96,000. It held that "where corporate property is sold to a stockholder at less than its fair market value, the transaction may be regarded as a bargain purchase with the 'bargain' element being taxed to a shareholder as a dividend. Southern Ford Tractor Corporation, 29 T.C. 833 (1958); and Stanley V. Waldheim, 25 T.C. 839 (1956), affd. 244 F.2d 1 (C.A.7, 1957)." 56 T.C. 388, 429. After discussing and weighing the significant factors that would apply in setting a valuation on closed corporation stock[5] and giving proper regard to the fact that Commissioner had the burden of proof on this issue, the Tax Court found the fair market value of the shares purchased by taxpayer to be $246,000.

The Tax Court in effect weighed the negative and positive factors and found that the positive factors of liquidation value and satisfactory after tax income, together with the capitalized value of past earnings based on a factor of four, clearly indicated a fair market valuation in excess of that paid by the taxpayer, setting the amount of $246,000. No doubt the adverse factors mentioned were depressants on fair market value and were properly considered by the Tax Court. The capitalization factor of four was certainly fair and objective under the circumstances, and this valuation in turn was diminished by an assessment of the adverse factors.

■■ Our review of the Tax Court proceeding is confined to a determination of whether there is substantial evidence upon the record as a whole to support that court's finding or, as sometimes stated, whether or not the determination is against the clear weight of the evidence or is induced by an erroneous view of the law. C.I.R. v. Riss, 374 F.2d 161, 166 (8th Cir. 1967); Arc Realty Company v. C.I.R., 295 F.2d 98, 102 (8th Cir. 1961). As pointed out in Wilmington Co. v. Helvering, 316 U.S. 164, 62 S.Ct. 984, 86 L.Ed. 1352 (1942), our appellate review is confined to an examination of whether there is substantial evidence to support the findings. Therefore, this court may not substitute its view of the facts for that of the Tax Court, and thus its findings when supported by substantial evidence are conclusive. The Tax Court's finding on the valuation of the stock was clearly within the limits of the fair market value evidence disclosed in this case.

■ The Tax Court, however, did not address itself to the total valuation of

---

5. The opinion reads:
"Among the factors which have been considered are: (a) The loss of indispensable corporate management, Estate of J. D. McDermott, a Memorandum Opinion of this Court dated Apr. 30, 1953, affd. 222 F.2d 665 (C.A.7, 1955); (b) trends in the earnings record of the corporatoin, Snyder's Estate v. United States, 285 F.2d 857, 862 (C.A. 4, 1961); (c) the value of the underlying assets held by the corporation, Trianon Hotel Co., 30 T.C. 156 (1958);

(d) the capacity of the corporation to pay dividends, O'Bryan Bros. v. Commissioner, 127 F.2d 645 (C.A.6, 1942), affirming 42 B.T.A. 18 (1940); (e) the fact that the stock being valued constitutes less than a controlling interest, Central Trust Co. v. United States, 305 F.2d 393, 432 (Ct.Cl.1962); and (f) the capitalized value of the corporation's past earnings, Tecla M. Straub, 29 B.T.A. 216, 221 (1933), affd. 76 F.2d 388 (C.A.3, 1935)." 56 T.C. 388, 430 (1971).

the stock and the subordinated note. The taxpayer contends, and we think rightly so, that the accommodation purchase of the stock and the subordinated note was part and parcel of the same transaction. Although we do not agree with the taxpayer's contention that this package could not have been sold to any third party at a valuation in excess of what he had paid for it, we do think the taxpayer should be given the benefit of a fair and objective valuation of the fair market value of the subordinated note on the date of purchase. Obviously this subordinated note, upon which no current payments were being made and which was subordinated to a large bank loan and dependent for payment upon the continued satisfactory operation of these cigar companies under the difficulties and hazards above discussed, could not have been sold for $215,000 on the market.

Liquidating this type of investment presents many difficulties, for the note would only appeal to a market investor at a sizeable discount and then only and probably in connection with an acquisition of the equity interest of the stock. Irrefragably the taxpayer advanced funds for this combined purchase in order to aid the faltering fiscal fortunes of T.M.E., and while he should be called to account for any bargain price he might have received on the stock, he should be given credit on the transaction for the fair market value of the subordinated note which he purchased as part and parcel of the acquisition cost of these assets. We think, therefore, that while the valuation found by the Tax Court on the stock is clearly in order and should stand, the cause should be remanded for a determination of the fair market value of the subordinated note at the time of the taxpayer's purchase, and credit should be given against the $96,000 constructive dividend for any diminution in market value of the note.

## BAD DEBT ISSUE

Operating in the red and suffering several sizeable judgments against it, Riss & Co. continued downhill during the early 1960's. During this period the Commercial National Bank of Kansas City, Kansas, made loans to Riss & Co., which were, for the most part, collaterally secured and guaranteed by the taxpayer. In May 1963 the bank loaned $125,000 to Riss & Co. collateralized with assignments of accounts receivable and the personal guarantee of the taxpayer. In August 1963, the bank became concerned about the collateral on its loan and called upon Riss & Co. and the taxpayer to pay the outstanding indebtedness of $125,000. Riss & Co. could not pay, and the taxpayer satisfied his guarantee to the bank by paying off the loan. He treated this as a business bad debt for the year 1963. After this loan was paid, the bank made an additional $10,000 loan to Riss & Co.

Taxpayer introduced evidence of opinions from knowledgeable attorneys that the debt due him from Riss & Co. was uncollectible in 1963 and became worthless in that year.[6] The Tax Court however found[7] that the debt had not become worthless in 1963 and denied the claimed bad debt deduction.

The same standard of review would apply on this Tax Court finding as discussed above, and we cannot overturn the denial of the bad debt deduction unless it lacks substantial evidence on the whole record. The burden of proof in this instance rests on the taxpayer in proving the debt worthless in the year claimed. Boehm v. Commissioner, 326 U.S. 287, 294, 66 S.Ct. 120, 90 L.Ed. 78 (1945); Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); C.I.R. v. Riss, 374 F.2d at 166; 5 Mertens Law of Federal Income Taxation § 30.28. As indications that the debt was not worthless in 1963, the

---

6. 26 U.S.C. § 166(a) provides for "wholly worthless debts" that "[t]here shall be allowed as a deduction any debt which becomes worthless within the taxable year."

7. 56 T.C. 388, 419 (1971).

Tax Court pointed to the fact that the Commercial National Bank lent Riss & Co. additional funds in December and that the taxpayer guaranteed other loans made to Riss & Co. by Colorado banks in 1964. It also apparently placed reliance upon taxpayer's testimony that if he had the money available he would have been willing to lend additional amounts to Riss & Co., even after suffering the trauma of honoring his guarantee.

The taxpayer suffered a heart attack in March 1964 and sold control of Riss & Co. in July 1964 to his son, Robert Riss, for $1,000. The company at that time had a substantial deficit in capital and surplus accounts, was subject to many outstanding liabilities, aggregating in excess of one million dollars, and was also faced with a 4.9 million dollar tax assessment. The corporate records were chaotic. The company after being taken over by Robert Riss, enjoyed a rejuvenation and apparently worked out of its financial difficulties.

■■ The proper test to be used in determining the worthlessness of a debt is the exercise of sound business judgment, and there is no black rubric standard. 5 Mertens, Law of Federal Income Taxation § 30.28. If collection seems hopeless to a reasonable man knowledgeable in the filed of business, a deduction is justified. See Loewi & Co. v. Commissioner, 232 F.2d 621, 625 (7th Cir. 1956). Nothing in the Code or Regulations requires a taxpayer to refrain from charging off a debt that he honestly and reasonably believes to be uncollectible, merely because the debtor might at some time and in some manner find himself able to pay. Elmira City Realty Corp., 16 C.C.H. Tax Court Mem. 235, 237 (1957). Otherwise stated, no creditor is required to be "an incorrigible optimist." United States v. White Dental Co., 274 U.S. 398, 403, 47 S.Ct. 598, 71 L.Ed. 1120 (1927). But he also must not be a "stygian pessimist." Ruppert v. United States, 22 F.Supp. 428, 431 (Ct.Cl.1938).

■■ In assessing the worthlessness or value of a debt, all of the perti-nent evidence including the value of the colleteral, if any, securing the debt and the financial condition of the debtor are to be considered. Treas.Reg. § 1.166–2(a). Riss & Co. had some valuable operating rights, which to a considerable extent were dormant but still subject to revival by use. These did not show upon its balance sheet (because of ICC regulations) and would be a plus factor to consider in assessing the intrinsic value of the company. Notwithstanding that favorable factor, there were many adverse factors relating to the fiscal solvency and operating ability of Riss & Co. The fact of survival as an operating entity is not conclusive, as Robert Riss had to inject new capital into the company and both taxpayer and T.M.E. wrote off over 1.7 million dollars of debt owed by Riss & Co. The company thus was clearly insolvent, and it would appear at that time that the chances of collecting the debt were at best minimal. We, however, do not write on a clean slate and are not privileged to inject our view into the proper inferences made by the Tax Court on this issue. While we think the issue is an extremely close one, we cannot say that the Tax Court's finding that the bad debt had not been proved worthless in 1963 is clearly erroneous or even that it lacks substantial evidence on the record as a whole.

■ The difficulty lies in the overall situation where an interested taxpayer is dealing with related corporations controlled by him and often makes advances in forms of loans which under the circumstances appear to be contributions to capital. The fact that the taxpayer continued to guarantee and make loans to Riss & Co. after honoring his guarantee is at least inconsistent with his claim that the debt was worthless. Also the taxpayer in paying the debt under his guarantee would be entitled to the collateral of accounts receivable placed with the bank. Certainly there would be some recoupment from these accounts receivable, which in turn would be strong evidence that the debt was not totally worthless in 1963. Thus, the taxpayer's granting of further loans to Riss

& Co. after claiming this debt worthless and failing to achieve any recoupment from the collateral posted with the bank loan give a strong indication that he intended to make a contribution to capital and that this debt was not totally worthless. Of course, the granting or extending of additional credit after failing to receive proper payment from a prior debt would also indicate that the debt was not worthless. A third party dealing at arms length would not extend credit after failing to receive payment on a sizeable antecedent debt, unless of course he either expected repayment or had additional motives to inject equity capital in a floundering enterprise. Under this factual situation we are unable to say that the Tax Court's finding that the debt was not proved worthless in 1963 lacks substantial support in the record.

The judgment of the Tax Court is affirmed on all of the above issues except the valuation of the subordinate promissory note at face value. Cause is remanded to the Tax Court for determination of the fair market value of that note.