ALLIED TUBE & CONDUIT CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Allied Tube & Conduit Corp. v. Commissioner
Docket No. 1848-73.
United States Tax Court
T.C. Memo 1975-281; 1975 Tax Ct. Memo LEXIS 92; 34 T.C.M. (CCH) 1218; T.C.M. (RIA) 750281; September 8, 1975, Filed Arnold Jay Cohen,Julian L. Berman, and S. Richard Fine, for the petitioner. Allan *94 E. Lang, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioner's Federal corporate income taxes: Fiscal Year Ending
Deficiency
Feb. 28, 1967
$ 12,688.85
Feb. 29, 1968
175,444.50
Feb. 28, 1969
23,304.46 Since certain adjustments made by the Commissioner have not been raised by the petitioner, two issues must be decided: (1) Whether the petitioner is entitled to deduct as depreciation the cost each year of various foreign and domestic patents used in its business; and (2) whether a portion of the gain reported from the licensing of patent rights in foreign countries must be reported as ordinary income to the extent it represents depreciation previously allowed or allowable. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Allied Tube & Conduit Corporation (Allied), a Delaware corporation since 1972, was originally incorporated in Illinois. At the time of filing its petition herein, its principal office and place of business was in Harvey, Ill. It filed its Federal corporate income *95 tax returns by use of the accrual method of accounting and on the basis of a taxable year ending on February 28 or 29. Such returns were filed for the years ending in 1967 and 1968 with the District Director of Internal Revenue, Chicago, Ill., and for the year ending in 1969, with the Internal Revenue Service Center, Kansas City, Mo. Hereinafter, a taxable year will be identified by the calendar year in which it ends. Allied is a manufacturer of electrical conduits; its principal product is electrical metallic tubing (EMT). Electrical conduit is galvanized steel tubing used to house and protect electrical wiring in buildings. EMT, one type of electrical conduit, is made to certain specifications of (1) outside dimensions, (2) wall thickness, (3) length, (4) outside coating of zinc to a specific thickness, (5) inside coating with several alternatives including paint, and (6) end-trimming to a bevel. The specifications are written by Underwriters Laboratories of Chicago, and when Underwriters Laboratories certifies that EMT produced by a manufacturer meets such specifications, the EMT can be so labeled. Allied also manufactures galvanized steel fence tubing and general purpose tubing *96 for use in a variety of industries. From its incorporation in 1959, Theodore H. Krengel has been Allied's president. Mr. Krengel has a bachelor of science degree in metallurgical engineering. From 1949 to 1959, he was in charge of quality control or production for various manufacturers of EMT. At that time, the standard method of producing EMT involved two separate stages or processes. A strip of steel was first formed into a tubular shape and the ends welded together on a tube mill. The tube was then cleaned and sized in several steps, and the finished tube was then cut to length and trimmed. These steps took place as the tube moved on a straight, continuous production line. The tube was then taken off the tube mill and galvanized through one of the several available processes. Mr. Krengel believed that the methods being used to produce EMT were both antiquated and inefficient. He began thinking of ways to improve the process. These ideas finally developed into the general proposition that it would be much more efficient to perform the galvanizing process while the tube was still moving on the tube mill. Such a procedure would allow the EMT to be produced on a single production *97 line. In order to make this process feasible, Mr. Krengel devised a new method for galvanizing the tube. His new process was later called the Flo-Coat process. Mr. Krengel discussed his new process with his employer. Although his employer was interested, it was unwilling to incur the expense of experimenting and developing a new process when its old method was profitable. It did have Mr. Krengel consult its patent attorneys, who advised him that the Flo-Coat process would not be patentable. Rebuffed by his employer, Mr. Krengel consulted other manufacturers of EMT concerning his process. However, none was willing to help him develop it. In 1959, Mr. Krengel had a number of conversations concerning the development of his process with his cousin, Morton Koch, a certified public accountant who lived and worked in the Chicago area. Mr. Koch's partner, Max Becker, also joined the discussions. After a series of meetings and negotiations, Mr. Koch and Mr. Becker agreed to try to form a group of investors who would be willing to invest money in a company formed to manufacture EMT by use of the Flo-Coat process. Mr. Krengel later met with a group of investors gathered by Mr. Koch and *98 Mr. Becker and explained the process. He told them that he felt that his process could produce EMT more efficiently and with less initial investment than the methods used by their competitors so that large profits could result. Mr. Krengel also advised the investors that he had been told that the process was not patentable. However, he felt that by being the first to develop and use the new method, they would have a tremendous advantage over their competitors. On November 16, 1959, Allied was incorporated. All of its stock was issued to Mr. Krengel and the other investors for $100,000. Debentures in the amount of $125,000 were later issued. Mr. Krengel quit his job and moved to Chicago to work for Allied. He found a factory, ordered equipment, and worked on establishing the process. While engineering the process, Mr. Krengel used several new inventions which he had previously designed. Allied began producing commercially acceptable EMT in September 1960. It has continually used Mr. Krengel's original Flo-Coat process, with certain improvements in the process made from time to time. In February or March of 1960, Mr. Krengel and Allied's legal counsel asked a patent attorney to *99 investigate the patentability of the Flo-Coat process. After studying it, the patent attorney advised them that the process was patentable and that patents should be obtained. Applications for patents were then prepared and filed. Upon learning that the Flo-Coat process was patentable, a dispute arose between Mr. Krengel and the other shareholders of Allied. Mr. Krengel argued that all patent rights in the Flo-Coat process (patent rights) belonged to him. He asserted that if he had known that his process was patentable, he would never have agreed to the terms of the formation of Allied and that he never intended to transfer any patent rights to Allied. The other shareholders, on the other hand, maintained that since they had put up very high-risk capital to form Allied, they should each own a proportionate share of the patent rights. After much negotiation, a compromise agreement was reached. It was agreed that Mr. Krengel would receive a 15-percent greater interest in the patent rights than he owned in Allied. The balance of the patent rights was to be owned by the rest of the shareholders of Allied in the same proportion as their stock holdings. To effectuate the compromise, *100 Mr. Krengel agreed to transfer his rights in the patent applications which had previously been filed, as well as subsequent modifications, to an engineering company to be formed by Allied. The new company was to be either a corporation or limited partnership, and it was to be owned by the shareholders of Allied in the same proportion as they held stock in Allied. Subject to certain limitations, Mr. Krengel was to be paid a bonus of 15 percent of the new company's net operating profit for the first 5 years and 20 percent for the next 5 years. The new company's sole purpose was to exploit the patent rights through sales or licenses. Allied was to receive no interest in the patent rights under this agreement. However, the engineering company was never formed. From 1960 until early 1963, Allied was in a very difficult financial situation due to a decline in the price of EMT. As a result, little thought was given to licensing the Flo-Coat process or to implementing the engineering company as previously planned. However, in the spring of 1963, several companies expressed an interest in obtaining permission to use the Flo-Coat process. These inquiries revived interest in licensing the process. *101 At that time, it was decided that it was not practicable to organize a separate engineering company to exploit the patent rights. Any license of the patent rights would also require the sale of technical know-how and engineering expertise which only Allied possessed. Since only Allied had the qualified personnel to install the Flo-Coat process, any license would involve a complex arrangement between Allied and the engineering company. To simplify matters, it was decided that Allied should purchase all of the patent rights, rather than form the engineering company. Thus, in May 1963, an agreement dated November 15, 1962 (the 1962 agreement), was made whereby Allied purchased all substantive rights in the Flo-Coat process, including the right to use the patent rights in its manufacturing operations, from Mr. Krengel and the other shareholders (sellers). Pursuant to their prior compromise, Mr. Krengel, who owned 20.345 percent of Allied's stock, was to receive 34.285 percent of the purchase price under the 1962 agreement. The other sellers were to receive the balance of the purchase price in the same proportion as they owned stock in Allied in 1960. Under the 1962 agreement, the purchase *102 price was to be 50 percent of Allied's net revenues from licensing or selling any or all of the patent rights to third persons. Allied promised not to enter into any license or sale unless it was a bona fide arrangement entered into in good faith. Payments to the sellers were to be made twice each year. Allied was not specifically required to seek licensing arrangements. None of the purchase price was to be measured by Allied's use of the patent rights in its manufacturing process. This method of paying for the patent rights was chosen for several reasons. At that time, Allied was not earning sufficient profits to pay a royalty to the sellers based upon its use of the patent rights in its own manufacturing operations. In view of the speculative value of the patent rights, it was thought that a fair method for determining the purchase price was to base it on the amount derived from the licensing or sale of such rights to third persons. Furthermore, if Allied's use of the process in its own manufacturing operations was successful, the value of the patent rights to third persons would be enhanced. At the time the 1962 agreement was made, it was unclear how Allied would exploit the *103 patent rights. However, it was anticipated that Allied could earn substantial revenues through licensing them, either in the United States or in foreign countries. While possible licensing arrangements had previously been discussed, no firm agreements had been made. In 1964, the first patent based upon the Flo-Coat process was issued in the United States. Subsequently, 10 other U.S. patents using the Flo-Coat process (domestic patent rights), including improvements on the original patents, were issued. Allied has also obtained patent protection in 22 foreign countries based upon the Flo-Coat process (foreign patent rights). The Flo-Coat process became very successful and enabled Allied to become one of the world's largest producers of EMT. In addition, it branched out into manufacturing steel tubing to be used for other purposes. As a result, other companies became interested in using the process. The first sale or license of the patent rights was made on November 22, 1965, when Allied granted the Matsushita Electric Works, Ltd. (Matsushita), an exclusive license in Japan, the Philippines, and several other Far Eastern countries, to manufacture electrical conduit by use of the *104 patent rights applicable in Japan (Japanese rights). The license was limited to the use of three production lines. Allied also sold technical know-how relating to the patents to Matsushita. Allied was to be paid $375,000.00 for the rights sold to Matsushita, of which $259,615.39 was allocable to the licensing of the Japanese rights. After reducing this amount by the expenses relating to the sale, Allied had net revenues of $227,180.20 from the license. Of this amount, $113,590.10 was due to the sellers under the 1962 agreement. On September 7, 1967, Allied granted Monmore Tubes Limited (Monmore) an exclusive license in the United Kingdom of Great Britain, Northern Ireland and the Isle of Mann, the Republic of Ireland, and the Channel Islands to manufacture galvanized metal tubing by use of the patent rights applicable in England (English rights). However, only three production lines using the Flo-Coat process were allowed. The total contract price for the license was $590,000.00, of which $434,493.00 was allocable to the English rights after deducting expenses. The amount of $217,246.50 was due the sellers under the 1962 agreement. On September 28, 1967, Allied licensed Matsushita *105 to use a fourth production line for $165,000.00. After deducting expenses, it was determined that $77,622.50 was due the sellers under the 1962 agreement. On February 7, 1968, Allied licensed Productos Especializados de Acero, S.A. (Productos), to manufacture galvanized steel tubing by use of the patent rights in Mexico and other Central American countries (Mexican rights). Only two production lines were allowed under this license. Of a total contract price of $460,000.00, after deducting expenses, $293,245.76 was allocable to the Mexican rights. Thus, $146,622.88 was due the sellers under the 1962 agreement. On February 10, 1969, Allied licensed Compania Industrial de Tubos de Acero, S.A. (CINTAC), to produce galvanized steel tubing in Chile and, under certain circumstances, in certain other South American countries, by use of the Flo-Coat process patent rights applicable in those countries (Chilean rights). A maximum of three production lines using the Flo-Coat process was allowed. Of the total contract price of $505,000.00, $317,017.00 was allocable to the Chilean rights after deducting expenses. Thus, $158,508.50 was due the sellers under the 1962 agreement. As a result of *106 the Flo-Coat process, Allied has enjoyed remarkable success. The following table shows its gross profits from patent licenses, its gross profits from operations, and its pre-tax net income (all rounded to the nearest thousand dollars): Fiscal
Gross Profit from
Gross Profit
Net Pre- Year
Patent Licenses
from Operations
tax Income
1961
0
$ (26,000)
$ (85,000)
1962
0
277,000
69,000
1963
0
315,000
62,000
1964
0
549,000
162,000
1965
0
1,232,000
196,000
1966
0
1,586,000
202,000
1967
$ 227,000
2,708,000
897,000
1968
561,000
3,869,000
1,243,000
1969
151,000
5,441,000
1,189,000
1970
(26,000)
6,351,000
941, 000
1971
108,000
6,182,000
537,000
1972
36,000
8,666,000
2,570,000
1973
204,000
10,467,000
1,344,000
1974
(27,000)
14,555,000
4,435,000
The Flo-Coat process has given Allied a competitive advantage in manufacturing EMT in the United States. Allied's share of the U.S.EMT market is close to 25 percent, and it is now the world's largest producer of EMT. In addition to EMT, Allied uses the Flo-Coat process to manufacture various other galvanized products. Other products handled by Allied, not manufactured *107 by use of the Flo-Coat process, have not been a significant source of profit. Allied has continued to seek licensing agreements in other foreign countries. Since 1969, it has granted exclusive licenses of the patent rights in Brazil and Holland. It plans to grant numerous licenses in other European countries in the future. However, the domestic patent rights, which Allied has the exclusive right to use, are significantly more valuable than all the foreign patent rights which it has already licensed or plans to license in the future. Thus, of all the patent rights acquired under the 1962 agreement, most of the purchase price was paid for the domestic patent rights. For its 1967 taxable year, Allied reported the gain on the licensing agreement with Matsushita as income. The only basis in the license claimed was apparently the costs incurred in making the licensing agreement. The transaction was reported as the sale of a capital asset held for more than 6 months so that all gain was long-term capital gain. Allied also deducted $113,590.10 from ordinary income in that taxable year as "[royalties] paid on account of acquisition of patent." It now contends that such amount is deductible *108 as depreciation for the patent rights acquired under the 1962 agreement. In its 1968 taxable year, Allied reported the gain on the licensing agreements with Matsushita, Monmore, and Productos as long-term capital gain and elected the installment method of reporting the gain on the Monmore and Productos licenses. The only basis claimed in these licenses was the expenses incurred in obtaining them. It also deducted $438,400.72 as "[amortization] of patent costs." In its 1969 taxable year, Allied reported the gain on the CINTAC license as long-term capital gain. The only basis claimed for the license was the expense incurred in obtaining it. It deducted $145,728.01 for the amortization of patent costs. In his notice of deficiency, the Commissioner disallowed the royalty and amortization deductions in the amounts of $113,590.10, $437,887.44, and $145,214.73 for the taxable years 1967, 1968, and 1969, respectively. [1] He also increased Allied's basis in the various licenses, thereby reducing the long-term capital gain reportable. OPINION
*109 We must decide whether Allied may deduct as depreciation the amounts paid or accrued [2] to the sellers each year under the 1962 agreement. Section 167(a) of the Internal Revenue Code of 1954[3] authorizes a deduction for a reasonable allowance for the exhaustion of property used in a trade or business or held for the production of income. Section 1.167(a)-3 of the Income Tax Regulations specifies that patents used in the business or held for the production of income for only a limited period may be the subject of a depreciation allowance. The basis upon which the deduction is determined is the adjusted basis of the property as provided in section 1011. Sec. 167(g). The petitioner *110 contends that the patent rights are property used in its business or held for the production of income; that they have a limited useful life; and that it may deduct the amount it paid or accrued each year to the sellers in accordance with the 1962 agreement as a reasonable allowance for depreciation under the rationale of Associated Patentees, Inc.,4 T.C. 979 (1945), and Rev. Rul. 67-136, 1967-1 C.B. 58. On the other hand, the Commissioner determined that the amounts paid to the sellers under the 1962 agreement were not paid for all the patent rights but were "direct costs" attributable to the particular license. Thus, he argues that the amount paid the sellers merely increased Allied's basis in the particular license, reducing the long-term capital gain reportable. The Commissioner also argues that the patent rights acquired in foreign countries are not depreciable property. He has not challenged the petitioner's right to report the gain on the licenses as the sale [4] of a capital asset. [5]
*111 The Commissioner's position in this case is obscured by the arguments presented by him in his brief. In the notice of deficiency, he asserted merely that the payments to the sellers in accordance with the 1962 agreement were direct costs of the foreign licenses and should be treated as a part of the bases of the licenses in determining the gain derived from them. In his opening statement, the counsel for the Commissioner stated: Essentially, it is Respondent's position that under the original purchase agreement in which Petitioner purchased these patent rights, no payments were to be made with respect thereto to the sellers except with respect to amounts received for subsequent dispositions by the Petitioner of these patent rights, and as such, these payments to the sellers are directly attributable to the proceeds received on these subsequent sales, and therefore constitute their cost basis, and should be so treated for purposes of computing its gains on the sales. However, in his brief, he argued that Allied acquired the domestic patent rights upon incorporation in a transfer governed by section 351. As a result, he asserted that its basis in these rights is determined pursuant *112 to section 362. Since Mr. Krengel had a zero basis in the rights, the Commissioner now argues that Allied has a zero basis in them, so that no depreciation is allowable. According to the Commissioner's argument, all payments under the 1962 agreement would thus be paid solely for the foreign patent rights. The petitioner vigorously objects to a consideration of such argument contending that it is in effect a new issue not timely raised and that it has no factual basis in the record. We agree with the petitioner. It is well settled that new issues raised for the first time on brief will not be considered. See Estate of Akos Anthony Horvath,59 T.C. 551, 554-557 (1973); Richard R. Riss, Sr.,56 T.C. 388, supp. opinion 57 T.C. 469, 474 (1971), remd. on another issue 478 F. 2d 1160 (8th Cir. 1973); Theatre Concessions,Inc.,29 T.C. 754, 760-761 (1958); Warner G. Baird,42 B.T.A. 970 (1940). In determining whether a new issue has been timely raised, we must decide whether the petitioner has *113 been surprised and substantially disadvantaged by the delay in raising the issue. See Estate of Akos Anthony Horvath,supra;Richard R. Riss, Sr.,supra.An issue cannot be raised for the first time after trial when to do so prevents the opposing party from presenting evidence he would and could have introduced if the issue had been timely raised. See Theatre Concessions, Inc.,supra.
In neither the notice of deficiency, nor his pleadings, nor his opening statement did the Commissioner inform the petitioner that he contended that it acquired the domestic patent rights upon its incorporation. The Commissioner's position, as expressed in his opening statement, appeared to be that since the payments under the 1962 agreement were measured by subsequent licenses or sales to third persons, the payments made were only related to the particular patent rights licensed or sold. Furthermore, during the course of the trial, the actions of the Commissioner's counsel were all consistent with the theory set forth in his opening statement, and in no way did his actions indicate that the Commissioner was asserting that the domestic patent rights were transferred *114 to Allied at the time of its incorporation. The parties had stipulated that when the petitioner was incorporated, its stock was issued for $100,000. When one of the petitioner's counsel sought to question a witness concerning its original capitalization, the counsel for the Commissioner objected, stating that this matter was covered by the stipulation. Moreover, none of the petitioner's witnesses were cross-examined by the counsel for the Commissioner concerning the original incorporation or the 1962 agreement, and the Commissioner offered no proof of his own on this issue. In its opening brief, the petitioner, with good reason, never discussed the possible argument that it acquired the domestic patent rights on incorporation. Obviously, it was surprised by the Commissioner's argument in his brief. Furthermore, it is clear that it was put at a disadvantage by the Commissioner's delay in raising the issue. The petitioner could have produced the testimony of the original incorporators to establish what was exchanged for its stock upon incorporation. To consider the Commissioner's argument at this time would penalize the petitioner for not producing such evidence which was irrelevant *115 to the issues as tried. The Commissioner's new argument raises a purely factual question. See Sarkes Tarzian, Inc. v. United States,240 F. 2d 467 (7th Cir. 1957). He had numerous opportunities to raise it, but did not choose to do so until after the trial in this case was completed. After reviewing these circumstances, we conclude that in effect the Commissioner's contention that the domestic patent rights were acquired by the petitioner on incorporation was the raising of a new issue, and since such issue was presented untimely, it will not be considered. See Estate of William Mandels,64 T.C. 61 (1975); Theatre Concessions, Inc.,supra.
Moreover, even if we were to consider this new issue, the evidence clearly shows that Allied never acquired title to the patent rights, including the domestic patent rights, until it entered into the 1962 agreement. The stipulated facts, documentary evidence, and all of the oral testimony support the conclusion that Allied did not acquire the domestic patent rights in the Flo-Coat process upon incorporation. Merely because Allied was allowed to use the process without charge until the 1962 agreement *116 was made does not prove that it had previously acquired all rights in the patent. At best, such evidence merely shows that it had a short-term, nonexclusive license to use the process. Initially, Allied was allowed to use the process without charge, because Mr. Krengel mistakenly believed that the process was not patentable, and thereafter, Allied was permitted to continue to use it without charge while Allied was becoming established and Mr. Krengel and the other shareholders worked out the conditions under which the patents were to be used. The Commissioner offered no evidence tending to contradict the evidence presented by the petitioner and never even cross-examined the petitioner's witnesses on this question. Therefore, even if the Commissioner had timely raised the issue, there is absolutely no factual basis to support it. Thus, we hold that Allied acquired all patent rights in the Flo-Coat process in the 1962 agreement and not upon its incorporation. Its basis in such rights is its cost as determined under that agreement. Sec. 1012. The Commissioner's remaining argument is that each payment to the sellers under the 1962 agreement only related to the particular rights licensed *117 and not all the rights. For that reason, he contends that the payments should be treated merely as a cost of granting the particular license. According to this argument, nothing was paid for the domestic patent rights. The Commissioner's argument ignores the terms of the 1962 agreement and the realities of this situation. By the terms of that agreement, all rights in the Flo-Coat process, including both the domestic patent rights and the foreign patent rights, were transferred to Allied pursuant to the agreement, and the amount to be paid to the sellers by Allied in accordance with the agreement constituted the purchase price for all the rights. The fact that the payments under the 1962 agreement were measured by licensing income does not mean that such payments were made only for the particular rights licensed. It was the acquisition of the domestic patent rights that made possible the spectacular growth of Allied. Hence, the domestic patent rights were by far the most valuable rights acquired by Allied under the 1962 agreement, and therefore, most of the payments made to the sellers under that agreement are properly attributable to the acquisition of the domestic patent rights. *118 The Commissioner points out that the petitioner was only required to make payments under the 1962 agreement if it had licensing revenue. Since it was not required to seek licenses, it could escape paying anything for the use of the patents. However, such circumstance is insufficient to convince us to adopt the Commissioner's position. The evidence clearly establishes that Allied intended to exploit the patents through licenses; to do so was in its own economic interests. At that time, the sellers had good reason to expect that licenses would be granted and that substantial income could be derived from them. In the light of these circumstances, there is no reason to conclude that the sellers were allowing Allied to use the patent rights without expectation of substantial compensation, and no reason to believe that Allied would refrain from granting licenses in order to avoid paying such compensation. The Commissioner would allocate the amounts paid or accrued to the sellers only to those foreign patent rights licensed each year. However, such an allocation is contrary to established law. When many assets are purchased at one time, the entire purchase price must generally be allocated *119 among the various assets acquired. See Welsh Homes, Inc. v. Commissioner,279 F. 2d 391, 395 (4th Cir. 1960), affg. 32 T.C. 239 (1959); Copperhead Coal Co. v. Commissioner,272 F. 2d 45 (6th Cir. 1959), affg. a Memorandum Opinion of this Court; Kraft Foods Co.,21 T.C. 513 (1954), revd. on other issues 232 F. 2d 118 (2d Cir. 1956); 3A Mertens, Law of Federal Income Taxation, sec. 21.32 (1968); cf. sec. 1.61-6(a), Income Tax Regs. The terms of the 1962 agreement provided no reason for deviating from the general rule so that the purchase price must be allocated on a pro rata basis among the assets acquired in accordance with that agreement. The Commissioner's argument that the foreign patent rights are not depreciable property is based on the assertions that Allied held these foreign patent rights for sale, expected them to appreciate in value, and reported gain from the licenses as capital gain. He argues that section 167 is only intended to compensate for the reduction in value of an asset over its useful life and should not be applied where the value of the asset may appreciate. *120 He cites no authority for his argument. Section 1.167(a)-3 of the Income Tax Regulations specifically recognizes that patents used in a trade or business or held for the production of income are property subject to a depreciation allowance, and there is no exception for foreign patents; in fact, the Commissioner does not argue that such provision does not apply to foreign patents. The reasons given by the Commissioner for not allowing depreciation of foreign patent rights may be equally applicable to all patent rights, domestic or foreign. Yet, since patents have limited useful lives, the right to a depreciation deduction was not affected by fluctuations in valuation through market appreciation. See Fribourg Navigation Co. v. Commissioner,383 U.S. 272, 279 (1966). Accordingly, we reject the Commissioner's argument and hold that the foreign patents, as well as the domestic patents, were depreciable property. The only remaining question is whether Allied *121 has used a depreciation method which produces a "reasonable allowance." It contends that since the total cost of the patents could not be ascertained when they were acquired, the most reasonable method of depreciation is to allow it to deduct the amount paid or accrued to the sellers each year under the 1962 agreement. It argues that this method will allow it to recover its basis in the patents over their useful lives and that under similar circumstances, the use of such method was approved by this Court in Associated Patentees, Inc.,4 T.C. 979 (1945). This Court has long recognized that patents whose cost is determined by future revenues present an unusual situation when computing a reasonable allowance for depreciation. See Associated Patentees, Inc.,supra;Best Lock Corp.,31 T.C. 1217 (1959); Myron C. Poole,46 T.C. 392 (1966). In Associated Patentees, we considered several possible methods for computing the depreciation allowance when the cost of a patent depends upon the revenues to be derived from its use. We concluded that *122 the most reasonable method to be used in such a situation was to allow the purchaser to deduct each year the annual payment made for the use of the patent. By following that method, the purchaser will recover his cost over the useful life of the patent. See Newton Insert Co.,61 T.C. 570, 586 (1974), on appeal (9th Cir., July 23, 1974). Although there are factual differences between the arrangement in this case for the payment of the sellers of the patents and those facts in the Associated Patentees case, the Commissioner has not argued that because of such differences, the holding of that case should not be followed by us in this case. Nor has he raised any questions concerning the methods used by the petitioner for computing the amounts of depreciation claimed by it. There is reason for applying the method of computing depreciation approved in the Associated Patentees case to the facts of this case, and the petitioner has reasons for computing its depreciation deduction as it did. Accordingly, we hold that it is entitled to deduct as depreciation the amounts claimed by it for such purposes. Cf. Paul J. Byrum,58 T.C. 731, 735 (1972). *123 Finally, the petitioner argues that section 1245 does not apply to its licenses of the foreign patent rights and requests that we re-examine our decision in Newton Insert Co.,supra.Section 1245 provides that when certain property is sold or otherwise transferred, any gain shall be treated as ordinary income to the extent of prior depreciation allowed or allowable with respect to such property. In Newton Insert Co., we held that section 1245 was applicable to the sale of a patent which had been depreciated in accordance with the method approved in Associated Patentees, Inc.,supra.The reasons given by the petitioner for requesting re-examination of our holding in that case were adequately considered by the Court in reaching its conclusion in such case, and since the opinion in the case was Court reviewed, there is no convincing reason for us now to change our position. Accordingly, we hold that section 1245 is applicable to the licensing of the foreign patent rights. In neither *124 his notice of deficiency nor answer did the Commissioner set forth any claim that the gains realized on the licenses of the foreign patent rights were subject to section 1245; nor did he offer any evidence as to how section 1245 should be applied in this situation. In his brief, he merely asserted that if the provisions of section 1245 are applicable, "they will automatically apply in the computation of [petitioner's] tax liability." However, we fail to see how the provisions of section 1245 can be applied automatically to the facts of this case. We have found that the payments made to the sellers under the 1962 agreement were deductible as depreciation with respect to all the patent rights acquired under that agreement, and in order to apply the provisions of section 1245 to the gains resulting from the licenses of the foreign patent rights, it is necessary to determine how much of that depreciation was allowed or allowable with respect to each of the foreign patent rights licensed. For section 1245 to be applicable, the Commissioner was required to plead it in the alternative. See Sheldon Tauber,24 T.C. 179, 185 (1955). *125 Yet, the petitioner treated the applicability of section 1245 as an issue in the case and presented evidence as to how it should be applied, and under such circumstances, we find that the petitioner has in effect waived any right to object to a consideration of the issue and has impliedly consented to its consideration. Rule 41(b)(1), Tax Court Rules of Practice and Procedure; see Prather v. Commissioner,322 F. 2d 931 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. Even though the petitioner has thus consented to a trial of the issue, the burden of proof with respect to it is on the Commissioner since he did not include any claim for the application of section 1245 in his notice of deficiency. Rule 142(a), Tax Court Rules of Practice and Procedure.
From the evidence that has been presented, it is difficult to ascertain with any certainty the proper amount of depreciation allowed or allowable with respect to each of the foreign patent rights licensed. Nevertheless, since it is clear that section 1245 should be applied to the gains derived from such licenses, we must, by the exercise of our best judgment, ascertain the amount of depreciation allowed or *126 allowable with respect to such licenses, resolving any doubts against the Commissioner who had the burden of proof with respect to such issue. Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930); Sidney Merians,60 T.C. 187 (1973). Based upon the amounts received from the licenses of foreign patent rights and reliable estimates as to the additional amounts to be derived from the sale of such rights, we can conclude that the aggregate amount derived or to be derived by Allied from the sale of foreign patent rights is approximately $3.5 million. We can determine the relationship between the value of each license to the total value of the foreign patent rights by use of a fraction, the numerator of which is the amount received from the granting of each license of a foreign patent right and the denominator of which is the aggregate amount derived from all licenses. The record contains expert testimony indicating that the domestic patent rights were far more valuable than the foreign patent rights, and on the basis of such testimony, we have concluded that 80 percent of the depreciation is allocable to the domestic patent rights each year and 20 percent *127 to the foreign patent rights. By multiplying the depreciation so allocable to the foreign patent rights by the fraction already obtained, we can ascertain the amount of depreciation allocable to each license of a foreign patent right for each year. By following these steps, the parties can compute the amount of depreciation allowed or allowable with respect to each license for purposes of the computations under Rule 155, Tax Court Rules of Practice and Procedure.
The Commissioner is disturbed by the fact that the petitioner reported the income from licensing the foreign patent rights as long-term capital gains while deducting one-half of the amounts paid or accrued to the sellers from ordinary income. What the Commissioner failed to realize is that most of the depreciation deductions were for the depreciation of the domestic patent rights. The income from the use of such rights was reported as ordinary income so that the petitioner was receiving no unusual tax benefit. While it is true that the portion of the depreciation allocable to the foreign patent rights licensed was deducted from ordinary income and the gains from the licenses were reported as capital gains, we are hereby *128 requiring a change in the treatment of such gains to the extent that the depreciation allowed or allowable was allocable to the foreign patent rights actually licensed. Decision will be entered under Rule 155.
Footnotes
1. There is no explanation in the record as to why these amounts varied from the amounts claimed on the tax returns for the years in issue.↩
2. The actual deductions claimed were slightly less than the amounts paid or accrued to the sellers each year. No reason for this difference has been given. ↩
3. All statutory references are to the Internal Revenue Code of 1954 as in effect for the years at issue.↩
4. See E. I. duPont de Nemours and Co. v. United States,432 F. 2d 1052 (3d Cir. 1970); Bell Intercontinental Corp. v. United States,381 F. 2d 1004 (Ct. Cl. 1967); Oak Manufacturing Co. v. United States,301 F. 2d 259 (7th Cir. 1962); Merck & Co. v. Smith,261 F. 2d 162↩ (3d Cir. 1958). 5. See secs. 1221, 1231(b); Bischel, Taxation of Patents, Trademarks, Copyrights, and Know-How, sec. 1.2C[1] (1974); but see Armco Steel Corp. v. United States,263 F. Supp. 749↩ (S.D. Ohio 1966).