DON L. DISE AND MARGARET F. DISE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Dise v. Commissioner
Docket Nos. 27660-82, 27665-82, 27692-82.
United States Tax Court
T.C. Memo 1986-87; 1986 Tax Ct. Memo LEXIS 522; 51 T.C.M. (CCH) 547; T.C.M. (RIA) 86087; March 4, 1986; As Amended March 6, 1986 *522 Ps purchased land from a corporation controlled by them.Held, if the purchase price was below fair market value of land, the excess is a dividend to Ps. Sheldon Chertow, for the petitioners. Janet A. Engel, for the respondent. SIMPSON
MEMORANDUM FINDING OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes: Deficiency
Petitioners
1976
1977
Don L. and Margaret F. Dise
$37,544
3,694
Jack C. and Nell B. Von Ehr
33,833
296
Cecil L. and Marilyn Fox
26,440
2,976
After concessions by the parties, the only issue remaining for decision is whether the petitioners received a dividend in 1976 through their purchase of property at a bargain price from a corporation controlled by them. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Don L. and Margaret F. Dise, husband and wife, and the petitioners, Cecil L. and Marilyn Fox, husband and wife, resided in Aurora, Ill., at the time their petitions in this case were filed. The petitioners, Jack C. and Nell B. Von Ehr, husband and *523 wife, resided in Oswego, Ill., at the time their petition was filed. Each couple filed their joint Federal income tax returns for 1976 and 1977 with the Internal Revenue Service, Kansas City, Mo.
Don L. Dise, Inc. (the corporation), was in the business of real estate development. In 1976, the petitioners owned nearly 90 percent of the outstanding shares of the corporation; members of their families owned the remaining shares. In 1970, the corporation purchased approximately 158 acres of unimproved farm land located south of Aurora, Ill., in Kendall County, for $400,000, or $2,532 per acre. About 148 acres were zoned for residential use; the remaining 10 acres (commercial property) were zoned B-3, suitable for business use. The commercial property is located in the northeast corner of the Boulder Hill development. The commercial property is bounded on the north by U.S. Bypass 30, on the east by Douglas Road, and on the south by Fernwood Road. U.S. Bypass 30 is a limited access highway; Fernwood and Douglas Roads are local streets. Most of the residential property in Boulder Hill near the commercial property was developed by 1976. The commercial property was improved by the *524 corporation through the addition of watermains and sewage facilities. Land to the north was still undeveloped in 1976. In 1975, the corporation sold approximately one acre of the commercial property to McDonald's for $100,000. The parcel was located in the northeast corner of the commercial property, directly on the corner of U.S. Bypass 30 and Douglas Road. As part of the transaction, the corporation executed a restrictive covenant stating that the commercial property and certain other property within a 2-mile radius of the McDonald's site would not be used for restaurant purposes for 20 years, with the exception of one additional sit-down restaurant, the menu of which would not be competitive with McDonald's. McDonald's was granted an easement of ingress and egress to and from the site, with the corporation agreeing to develop, maintain, and repair the easement area. In 1976, McDonald's acquired approximately three-tenths of an acre of adjoining commercial property from the corporation for $28,860, or approximately $96,000 per acre. On June 25, 1976, the corporation sold the remaining commercial property (subject property) to Don L. Dise, Cecil L. Fox, and Jack Von Ehr (the *525 petitioners) for $70,000, or about $8,000 per acre. Each purchaser had an equal interest in the property. At the time of sale, an appraisal estimated the fair market value of the subject property to be $70,000. Although not mentioned in the appraisal, the water flow on the subject property was below the municipal requirements for commercial or business use. On September 7, 1978, the petitioners sold an approximately one-half acre parcel of the subject property for $41,750, or $74,288 per acre. The lot was located directly west of McDonald's and was used as a day care center named Kindercare. The petitioners provided Kindercare with an essement similar to that appurtenant to the McDonald's site. Additionally, they were obligated to provide adequate water and sewer extensions to the lot. The total cost of the required improvements was approximately $12,000. No transfer of the subject property has taken place since the sale to Kindercare. In 1978, the Village of Montgomery, where the subject property was located, took the position that the subject property could not be developed further for commercial use without improvements that would increase the water flow. Plans were being *526 considered for the development of the area north of U.S. Bypass 30, and the water improvements were also required for the development of that area. The required improvements included the laying of larger watermains, and the total cost of such improvements was estimated to be about $200,000. At the outset, it was believed that such costs would have to be borne by a developer although they could be passed on to the purchaser of the property. In 1983, the village made the necessary improvements. In his notices of deficiency, the Commissioner determined that the fair market value of the subject property was $250,000 at the time it was distributed to the petitioners and that each of the petitioners received a dividend of $60,000, the difference between what he paid for his share of the property and the value of such share. OPINION The only issue for decision is whether the corporation's sale of the subject property to the petitioners resulted in their receiving a dividend. If property is sold by a corporation to a shareholder for an amount which is less than its fair market value, the transaction *527 is regarded as a bargain purchase, and the "bargain" element may be taxed to the shareholder as a dividend. Green v. United States,460 F.2d 412, 419 (5th Cir. 1972); Brittingham v. Commissioner,66 T.C. 373, 409-410 (1976), affd. per curiam 598 F.2d 1375 (5th Cir. 1979); Riss v. Commissioner,56 T.C. 388, 429 (1971), supp. opinion 57 T.C. 469 (1971), affd. on this issue 478 F.2d 1160 (8th Cir. 1973); Dellinger v. Commissioner,32 T.C. 1178, 1181-1182 (1959). On the other hand, where the amount paid by a shareholder is equal to the fair market value of the property, the sale cannot be regarded as a bargain purchase since the net worth of the corporation is not diminished by such a transaction. See Southern Ford Tractor Corp. v. Commissioner,29 T.C. 833, 841-842 (1958). In determining the existence of a dividend, the courts have looked to the economic effect of the transactions; the intent of the parties is not dispositive in characterizing a distribution as a dividend. See Baumer v. United States,580 F.2d 863, 876 (5th Cir. 1978); *528 Magnon v. Commissioner,73 T.C. 980, 993-994 (1980). The crucial concept is whether the corporation conferred an economic benefit on the stockholder without the expectation of repayment. Gibbs v. Tomlinson,362 F.2d 394, 397 (5th Cir. 1966). Thus, we must decide on the fair market value of the subject property when it was transferred to the petitioners. The determination of the fair market value of property at a given date is a question of fact. Kaplan v. Commissioner,43 T.C. 663, 665 (1965).The term fair market value has been defined as the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under a compulsion to buy or to sell and both being reasonably well informed as to all relevant facts. See Alvary v. United States,302 F.2d 790, 794 (2d Cir. 1962); Epstein v. Commissioner,53 T.C. 459, 472 (1969); Newberry v. Commissioner,39 B.T.A. 1123, 1128-1129 (1939); sec. 1.170A-1(c)(2), Income Tax Regs. *529 The petitioners have the burden of proving that the Commissioner's determination of value was erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure[2]; see also Brittingham v. Commissioner,66 T.C. at 410. The parties have presented evidence and the testimony of expert witnesses in order to substantiate the values alleged by them. The petitioners' valuation of the subject property is supported primarily by the testimony and opinion of James L. Coleman, Sr. Mr. Coleman has been designated an MAI by the American Institute of Real Estate Appraisers and an SRPA by the Society of Real Estate Appraisers. Since 1960, he has been appraising real estate in Kendall County. In determining the fair market value of the subject property, Mr. Coleman used the comparable sales method. He assumed that the highest and best use of the subject property was commercial, specifically as a convenience center. He analyzed the sales of six comparable parcels and concluded that in June 1976, the subject property was worth approximately $121,000, or $14,000 per acre. After hearing testimony *530 concerning the lack of water sufficient to allow commercial use of the property, Mr. Coleman revised his appraisal downward to $68,301, or $7,877 per acre. The Commissioner's valuation of the subject property was based on an appraisal performed by John W. Moyer. Mr. Moyer is a senior member of the American Society of Appraisers and the American Right of Way Association, as well as a senior residential member of the Society of Real Estate Appraisers. He has been engaged in appraisal work since 1955. Mr. Moyer also used the comparable sales method to determine the fair market value of the subject property. After determining that the highest and best use of the subject property was for general retail business, such as a convenience or service center, he analyzed the sales of five comparable properties and arived at a fair market value of $226,500, or $25,000 per acre. [3]
A comparable *531 sale is a sale of property that would be a reasonable alternative to the subject property for most prospective buyers. E. Friedman, Encyclopedia of Real Estate Appraising 38 (3d ed. 1978).Adjustments are made to the comparable sale price to reflect differences between the comparable property and the property being appraised. American Institute of Real Estate Appraisers, The Appraisal of Real Estate 281-284 (8th ed. 1983).Aftr reviewing all the sales analyzed by both experts, we conclude that the sale of 2020 E. New York St. (first comparable) and the sale of 2424 E. New York St. (second comparable) involve properties that are reasonable alternatives to the subject property: both sales occurred within 1 year of the sale at issue, and the size of each property is reasonably close to that of the subject property. The superiority of these sales is demonstrated by their appearance in each expert's appraisal and by the fact that they required less drastic adjustments than the other sales. [4] Consequently, the Court will base its decision as to fair market value upon these two comparable sales. *532 The 2.162-acre first comparable was sold in December 1976 for $70,000, or $32,377 per acre. The 5.68-acre second comparable was sold in October 1975 for $151,000, or $26,585 per acre. Both properties had all utilities except sewer, and neither had any deed restrictions. To determine the fair market value of the subject property, we must first decide on what adjustments are to be made to the sales prices of those comparables. Changes in market conditions are reflected by time adjustments. American Institute of Real Estate Appraisers, The Appraisal of Real Estate, supra at 315-316. To reflect market appreciation, Mr. Coleman used a 5-percent per annum adjustment for sale prior to the sale of the subject property and a 10-percent per annum adjustment for those occurring after the sale. Mr. Moyer testified that he used adjustments in the range of 5 to 10 percent and stated that the annual rate of appreciation increased from 1970 to 1980. However, his appraisal reflects a 5-percent per annum adjustment for every sale. We find Mr. Coleman's adjustments appropriate because they reasonably *533 reflect the increase in the rate of appreciation which occurred through the 1970s. Therefore, we hold that a negative adjustment of 5.00 percent must be made to the price of the first comparable and a positive adjustment of 3.50 percent to the price of the second comparable. Differences in the locational characteristics of a comparable property and the subject property are reflected in a location adjustment. American Institute of Real Estate Appraisers, The Appraisal of Real Estate, supra at 316. Mr. Coleman made a minus 25-percent location adjustment to the sale price for the first and second comparables, while Mr. Moyer made minus 10-percent location adjustments. Thus, the experts agree that some location adjustment should be made to the sales prices of the comparables, but they disagree as to the amount thereof. After a careful review of the locations of the comparables and the subject property, we believe that a minus 15-percent location adjustment accurately reflects the superior location of the two comparables, which are located on busier highway. All other things being equal, *534 a parcel of land which is large parcel. This difference is corrected by a size adjustment. Both experts made adjustments to reflect the relatively large size of the subject property. Mr. Moyer's adjustment was a minus 10 percent to the sale price of each of the comparable, but Mr. Coleman's adjustments were minus 20 percent for the first comparable and minus 10 percent for the second comparable. Since they reflect the relative size of the three parcels--the subject property, 8.671 acres, the second comparable, 5.68 acres, and the first comparable, 2.162 acres, we believe that Mr. Coleman's adjustments for size were proper. Neither the first nor second comparable was subject to any restrictive covenants. Mr. Coleman made a minus 10-percent adjustment to the sales prices of the comparables to reflect the restrictive covenant attached to the subject property. Mr. Moyer felt that no adjustment was necessary for such purpose. In our opinion, the restrictive covenant has impaired the value of the subject property. Restaurants are a prime user of roadside property, and the owner of the subject property cannot freely deal with them until 1996. Consequently, we hold that some adjustment *535 is required to give effect to the restrictive covenant, but in our judgment, a 5-percent adjustment is adequate. The absence of a utility is an important consideration in determining property value. American Institute of Real Estate Appraisers, The Appraisal of Real Estate, supra at 170. Both the first and second comparables had all utilities but sewer. Neither expert made an adjustment because of the lack of sewer service on the comparables; apparently, they did not consider that deficiency to be significant, and we accept their judgment.Mr. Moyer made no adjustment for lack of adequate water on the subject property on the basis that none was needed because, in 1976, no one knew of the water problem. In his initial valuation of the subject property, Mr. Coleman, also, made no adjustment for lack of adequate water on the subject property, but at trial, he testified that he did not realize the expense involved in remedying the water problem when he prepared his written report, and that a minus 51-percent adjustment, to a fair market value of $68,301, was necessary to reflect this cost. *536 In our judgment, an adjustment is required because of the water problem. Mr. Faltz, vice president of the corporation, stated that while developing units 26 and 27 of Boulder Hill during 1973 through 1976, he became aware that there was insufficient water flow on the subject property. Even if not generally known, the water shortage problem was readily discoverable. The size of the existing watermains and the municipal requirements for the water flow were readily available. In fact, the exact extent of the water needs of the subject property were easily quantified in a 1978 preliminary report on water system enhancements needed in that area. Therefore, we believe that a reasonably informed buyer, the standard for determining fair market value, would have discovered the water problem. While we agree with Mr. Coleman that an adjustment is necessary because of the water problem, we do not agree with the adjustment made by him. We accept his method of discounting the 1976 value of the subject property at the rate of 10 percent a year for 7 years, the period during which it was impractical to develop the property because of the water problem. However, his method overlooks the fact *537 that property generally was appreciating in value during that period. A proper discount factor should take into consideration lost earnings, but it should also take into consideration anticipated appreciation in value. When we consider such appreciation in value, we conclude that an appropriate discount factor is 3 percent. In conclusion, it will be necessary to recompute the fair market value of the subject property and to prepare a decision in accordance with Rule 155. In making such computation, they should give effect to the adjustments indicated in this opinion, determine the fair market value of the subject property in 1976, and discount that value in accordance with this opinion. If the value of the subject property so determined exceeds the amount paid for it by the petitioners, the excess is a dividend. Decisions will be entered under Rule 155.
Footnotes
1. The following cases were consolidated for trial, briefing, and opinion: Jack C. Von Ehr and Nell B. Von Ehr, docket No. 27665-82; and Cecil L. Fox and Marilyn Fox, docket No. 27692-82.↩
2. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.↩
3. We observe that a math error by Mr. Moyer may change this figure somewhat. See n. 4 infra.↩ However, for reasons set forth subsequently in the opinion, any such change is not relevant to our decision.
4. The adjustments made by each expert were as follows: Comparable Sale
Mr. Coleman
First
Second
#1
Comparable
Comparable
#4
#5
#6
Composite adjustment
-80%
-60%
-41.50%
-85%
-30%
-35%
Gross adjustment
90%
60%
48.50%
95%
80%
95%
Mr. Moyer
First
Second
#1
#2
#3
Comparable
Comparable
Composite adjustment
20%
90% * -67.50%
-22.50%
-17.50%
Gross adjustment
60%
90%
87.50%
22.50%
22.50%
*math error in report, should read -57.50%. The composite adjustment is a net figure which results from adding positive and subtracting negative adjustments. The gross adjustment provides a more accurate indication of the comparability of sales because it reflects the total adjustments made without regard to being negative or positive. ↩