PAUL J. BYRUM AND EVELYN J. BYRUM, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1435–71. Filed August 1, 1972.

*Daniel S. Davisson*, for the petitioners.
*Robert G. Martinell*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' joint Federal income tax returns for 1967 and 1968 in the amounts of $4,005.92 and $4,571.79, respectively. Concessions having been made by the parties, the only issue for decision is whether the stock of petitioner Paul J. Byrum in Chappell Securities Corp. became worthless in 1967.

#### FINDINGS OF FACT

Paul J. Byrum (hereinafter referred to as petitioner) and Evelyn J. Byrum, husband and wife, were legal residents of Anderson, Ind., at the time they filed their petition. They filed their joint Federal income tax returns for 1967 and 1968 with the district director of internal revenue, Indianapolis, Ind.

Chappell Securities Corp. (hereinafter referred to as Chappell) was formed in 1959. Prior to 1967, it was an intrastate brokerage firm engaged in the marketing of Indiana stocks and securities. Initially, Chappell was a closely held corporation, but became publicly held in

1964 when it authorized and offered to the public 100,000 shares of stock at $10 per share. Petitioner purchased 3,000 of these shares of Chappell stock in 1964. Sometime in 1965, Chappell authorized additional shares at $15 per share par value, and petitioner purchased some of those shares. As of December 31, 1967, petitioner owned 4,486 shares of stock in Chappell. He had held these shares for more than 6 months, and his basis in the stock was $36,372.98.

In 1965, the major portion of Chappell's business consisted of the sale of stock in Investment Corp. of America (hereinafter ICA). The offering price for the stock in ICA was $20 per share. In June of that year, the Securities and Exchange Commission (hereinafter the SEC) ordered Chappell to stop selling the stock of ICA to the public. The SEC also took the books and records of Chappell and held them until 1968.

Although the SEC order did not cover all the stock issues in which Chappell was dealing, the effect of this action made it very difficult for Chappell to continue making sales of stocks in other corporations. In about February or March 1967, Chappell closed its office and ceased trying to sell any stock to the public. In December of that year, the officers of Chappell were indicted on numerous counts in the nature of fraud. These indictments received much publicity.

Upon hearing of the indictments against Chappell's officers, petitioner attempted, in 1967, to sell his stock in Chappell but was told there was no market for it.

Between 1967 and the trial of this case on February 23, 1972, Chappell maintained no books or records. Its main asset consisted of 50,000 shares of ICA, which owns certain land in Brazil on which cattle are kept. Chappell's other assets included eight companion crypts in Washington Park East Cemetery, an uncollectible note for $250,000, several thousand shares of stock in bankrupt companies, and miscellaneous other stocks that are not being traded. Among Chappell's liabilities in February 1972 are an attorney's fee, a fee due a national accounting firm, and a telephone bill in excess of $1,500.

Since 1967, petitioner has received no correspondence from Chappell and has received no stockholder reports or dividends from it. Chappell has maintained no records on its assets.

In 1970, petitioner attempted to sell his stock in Chappell, and was offered 2 cents per share in a package arrangement with the sale of other securities he owned. In 1971, petitioner, while he was selling other securities, again attempted to sell the Chappell stock and was offered 1 cent per share.

Petitioner claimed a capital loss deduction on his 1967 joint Federal income tax return and claimed a loss carryover on his 1968 return

based upon the worthlessness of his shares of Chappell securities in 1967. Respondent, in his notice of deficiency, disallowed the claimed loss on the ground that petitioner had failed to establish that the stock became worthless in 1967.

### ULTIMATE FINDING OF FACT

Petitioner's stock in Chappell Securities Corp. became worthless in 1967.

### OPINION

We are again confronted with the troublesome question as to whether a minority stock interest in a defunct corporation is worthless and, if so, in what year it lost its value. Section 165(a)[1] provides that "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(g) states that "If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset." The regulations (sec. 1.165–5(c), Income Tax Regs.) provide that "If any security which is a capital asset becomes wholly worthless at any time during the taxable year, the loss resulting therefrom may be deducted under section 165(a)."

Petitioner contends that his Chappell stock became worthless in 1967. Respondent contends that the stock is not worthless but, alternatively, if it is worthless, it lost its value in 1965 rather than 1967. The issue is factual. It must be answered in the light of the objective facts, and petitioner has the burden of proof. *Boehm v. Commissioner*, 326 U.S. 287 (1945).

A classic statement of the standard to be employed in evaluating the evidence was given in *Sterling Morton*, 38 B.T.A. 1270, 1278–1279 (1938), affd. 112 F. 2d 320 (C.A. 7, 1940), as follows:

The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation.

Respondent's alternative contention—that the stock, if it is worthless, lost its value in 1965—is based upon the misapprehension that the SEC ordered Chappell in that year to cease selling its own stock to the public. The evidence is that Chappell was directed by SEC to cease selling ICA stock, and the order did not refer to Chappell's stock. The sale of the ICA stock represented the major portion of Chappell's business, and the SEC took Chappell's books and records in 1965 and kept them for 3 years. However, Chappell apparently continued to carry on business activities until February or March 1967, when it closed its doors. In view of these facts, we do not think the Chappell stock became worthless in 1965. Accordingly, we are left with the question whether it lost its value in 1967.

With respect to the second factor mentioned in the above quotation from *Sterling Morton*—the value the stock may acquire through future foreseeable operations—the possibility that Chappell will ever recover and become a viable entity appears, from this record, to be nil. The brokerage business is peculiarly one in which public confidence in the integrity and good judgment of its officers and managers is essential. As noted above, Chappell closed its doors in 1967, and extensive publicity was given to the indictments later that year of all of its officers on multiple counts of fraud. After the occurrence of these events, we think it apparent that Chappell had no potential earning capacity as a securities brokerage firm. This conclusion is confirmed by the absence of any business activity on its part between 1967 and the date of the trial of this case.

The question whether Chappell had any liquidation value in 1967 is much more difficult; and the record is not entirely satisfactory on this point. However, the gaps in the record are explained at least in part by SEC's taking Chapell's books and records in 1965, Chappell's closing its doors in 1967, the indictment of its officers in that year, and the failure of anyone to preserve and maintain any reliable record of its assets since that time. Petitioner, a minority shareholder with no firsthand knowledge of the company's business, obviously was hard-pressed in attempting to construct a reliable Chappell balance sheet, In such circumstances, the decision as to whether the Chappell stock had any liquidation value in 1967 must be made through the exercise of business judgment in the light of as complete information as is reasonably obtainable. *Blair* v. *Commissioner*, 91 F. 2d 992, 994 (C.A. 2, 1937) ; *Giffin Andrew*, 54 T.C. 239, 248 (1970).

Petitioner, in an attempt to establish the relevant facts, introduced the testimony of the last-elected secretary-treasurer of Chappell, one of the officers who were indicted. That officer testified that the corporation had no financial statements or records of any kind for the years from 1967 to the date of the trial of the present case. He further testified that the assets of Chappell consisted of some securities in bankrupt corporations, some other stocks which are not being traded, eight companion crypts in a cemetery, an uncollectible note, and 50,000 shares of ICA stock.

The only asset which appears to have any possible substantial value is the ICA stock, and the witness testified that, in his opinion, any value which may be ascribed to it is highly speculative. We note that this is the stock which Chappell was directed by SEC, in 1965, to cease selling, and it evidently has not been publicly traded since that time. While there is testimony that ICA owns some land in Brazil on which someone is grazing cattle, there is no direct evidence of its financial situation or the value of its stock. Nor is there evidence as to what portion of ICA's stock was represented by the shares owned by Chappell. However, from the evidence presented, we think the only reasonable inference is that, whatever value the ICA stock may have had, it was not sufficient to give petitioner's stock in Chappell any practical value.

The national accounting firm and the attorney to whom Chappell owes fees were in positions which enabled them to obtain peculiarly reliable information as to the net value of Chappell's assets. Yet 5 years have passed since Chappell closed its doors and neither those creditors nor the telephone company have evidently taken steps to apply the assets of this defunct corporation to the payment of their claims. As a stockholder, petitioner's liquidation rights, of course, would fall behind the claims of these and any other creditors. From these facts it reasonably may be inferred that petitioner could have realized nothing if he had attempted, in 1967, to force a liquidation of Chappell. This conclusion is confirmed by petitioner's unsuccessful attempts to sell his Chappell stock in 1967, and again in 1970 and 1971.

In the circumstances of this case, we think the evidence produced by petitioner was at least sufficient to establish prima facie that petitioner's Chappell stock became worthless in 1967. The burden thus shifted to respondent to present evidence to the contrary. Yet he called no witnesses, offered no exhibits to refute the case presented by petitioner, and developed nothing of significance through cross-examination. On this record, we hold that petitioner is entitled to the disputed deduction.

To reflect the concessions made by the parties and our Findings,

*Decision will be entered under Rule 50.*