ERICH MEYER and ILSE M. MEYER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DONALD F. COX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meyer v. Commissioner
Docket Nos. 6667-78, 10169-78.
United States Tax Court
T.C. Memo 1986-328; 1986 Tax Ct. Memo LEXIS 277; 51 T.C.M. (CCH) 1634; T.C.M. (RIA) 86328; July 30, 1986. *277 Talmud Properties Partnership[1]
Nancy V. Powell, for the petitioners. Barbara M. Leonard, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax under section 6653(a)[2] for the taxable year 1974 in the following amounts: Deficiency
Addition to Tax
in
I.R.C. 1954
Petitioners
Year
Income Tax
Section 6653(a)
Erich Meyer and
Ilse M. Meyer
1974
$457,420
$22,871
Donald F. Cox
1974
66,305
3,315
*278 The issue for decision is whether petitioners are entitled to deduct on their 1974 income tax returns amounts claimed as distributive losses from Talmud Properties Partnership, which distributive losses resulted entirely from an interest deduction claimed on the partnership's 1974 return of income. This case is before us on this severed issue only. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Erich Meyer and Ilse M. Meyer, husband and wife, who resided in San Francisco, California, at the time their petition in this case was filed, filed a joint Federal income tax return for the calendar year 1974. Donald F. Cox, who resided in Tiburon, California, at the time his petition in this case was filed, filed an individual Federal income tax return for the calendar year 1974. The signatures of Erich Meyer and Donald F. Cox, along with the signatures of P. Michael Hunt, Werner Erhard, Anglo Dutch Capital Co. (ADC), a California corporation, by Harry Margolis, president, Erhard Seminars *279 Training, Inc. (EST) by K. Laurel Scheaf, president, and Gerald L. Schulman appear on a document stated to be a "Partnership Agreement." Messrs. Meyer, Cox, Hunt, Erhard and Schulman were clients of Mr. Harry Margolis, and EST was a client of Mr. Margolis. Mr. Harry Margolis is the sole owner of ADC. The statements in this document are to the effect that Talmud Properties Partnership (Talmud) is organized as a general partnership consisting of the individuals and entities whose signatures appear on the instrument. The records maintained in Mr. Harry Margolis' office for Talmud show the following amounts received as contributions from the partners indicated: Gerald Schulman
P. Michael Hunt
Erich Meyer
500,000
Donald F. Cox
80,000
EST
250,000
ADC
100,000
Werner Erhard
70,000
Total
$1,000,000
The bank records and other records of Talmud and of Antigua Banking Limited (ABL), an Antigua company the stock of which was owned by a New Hebrides company and which was directed and managed by Mr. Margolis, show that on December 2, 1974, $70,000 was transferred from ABL's account at Barclays Bank California to Werner Erhard's account at that bank, $80,000 was *280 transferred from ABL's account at Barclays Bank California to Donald F. Cox's account at that bank, and $250,000 was transferred from ABL's account at Barclays Bank California to EST's account at that bank. The records show that on December 2, 1974, $80,000 was transferred from Donald F. Cox's account at Barclays Bank California, $70,000 from Werner Erhard's account at that bank, $250,000 from EST's account at that bank, and $500,000 from Erich Meyer's account at that bank to Talmud's account at Barclays Bank California. The record further shows a transfer to Talmud's account at Barclays Bank California of $100,000 from an undisclosed source. The record further shows that on December 2, 1974, $1 million was transferred from Talmud's account at Barclays Bank California to ABL's account at that same bank. The record of ABL shows that the $1 million transferred to its bank account at Barclays Bank California is entered on its records as interest paid. A document entitled "Agreement to Purchase and Finance Properties" stated to be between Talmud and World Entertainers (WE), a foreign entity originally organized at the request of Mr. Harry Margolis, dated November 18, 1974, bears *281 the signature of Talmud by Gerald L. Schulman and Donald F. Cox and the signature of WE by Lee Bing Chuen. Donald F. Cox's signature is dated "4/14/76." This document recites that Talmud will lend $10 million to WE interest-free for 1 year in exchange for a commitment by WE to provide to Talmud over a period of 5 years $30 million of financing at 5 percent. The document further recites the type of properties which may be involved in the financing, namely properties that have a long-term lease with a recognized tenant, such as a United States Post Office, with a fixed rental payment. The agreement further recites that for each property that meets the criteria set forth in the document submitted by Talmud to WE, WE will pay 1 percent of the value of the property to Talmud and if the property is accepted for financing, will pay 5 percent of its value to Talmud. The bank records of Talmud and ABL at Barclays Bank California show the following series of transfers on December 6, 1974: From
To
Amount
Bank Charge
ABL
Talmud
$100,000
Talmud
ABL
100,000
ABL
Talmud
1,000,000
Talmud
WE
1,000,000
$25
On December 6, 1974, the following amounts were transferred *282 to ABL's account at Barclays Bank California from Barclays Bank Tortola: From
To
Amount
Barclays Bank Tortola
ABL
$901,000
Wickhams Cay Trust Co.
ABL
1,050,000
Wickhams Cay Trust Co. is a trust company registered in the British Virgin Islands. It was formed in 1974 and Noel Barton is registered as its director. Wickhams Cay Trust Co. has a minimal net worth in its own right. On December 9, 1974, the following transfers to and from the accounts of Talmud and ABL from their bank accounts at Barclays Bank California are shown by their records and the records of Barclays Bank California: From
To
Amount
ABL
Talmud
$100,000
Talmud
ABL
100,000
ABL
Talmud
1,000,000
Talmud
WE
1,000,000
ABL
Talmud
550,000
Talmud
ABL
50,000
Talmud
WE
500,000
ABL
Talmud
550,000
Talmud
ABL
50,000
Talmud
WE
500,000
ABL
Talmud
550,000
Talmud
ABL
50,000
Talmud
WE
500,000
ABL
Talmud
100,000
Talmud
ABL
100,000
ABL
Talmud
1,000,000
Talmud
WE
1,000,000
ABL
Talmud
100,000
Talmud
ABL
100,000
ABL
Talmud
1,000,000
Talmud
WE
1,000,000
The bank records of ABL at Barclays Bank California for December 9, 1974, show *283 the following series of transfers to ABL's account from a nominee's account at Barclays Bank Tortola: Transfers
From Nominee's Account
To ABL's Account
$901,000
$250,000
900,000
150,000
901,000
694,000
900,000
694,000
901,000
568,000
900,000
600,000
901,000
855,000
900,000
601,000
901,000
701,000
485,000
711,000
650,000
The primary source of funds for ABL was WE. The bank records at Barclays Bank Carifornia of Talmud and ABL show the following series of transfers to and from those accounts on December 20, 1974: From
To
Amount
ABL
Talmud
$50,000
Talmud
ABL
50,000
ABL
Talmud
500,000
Talmud
WE
500,000
ABL
Talmud
100,000
Talmud
ABL
100,000
ABL
Talmud
1,000,000
Talmud
WE
1,000,000
ABL
Talmud
100,000
Talmud
ABL
100,000
ABL
Talmud
1,000,000
Talmud
WE
1,000,000
ABL
Talmud
200,000
Talmud
ABL
200,000
ABL
Talmud
1,000,000
Talmud
WE
1,000,000
ABL
Talmud
1,000,000
Talmud
WE
1,000,000
The bank records of ABL at Barclays Bank California show the following transfers to ABL's account from a nominee's account at Barclays Bank Tortola on December 20, 1974: Transfers
From Nominee's Account
To ABL's Account
$945,000
$600,000
$300,000
150,000
950,000
150,000
1,000,000
850,000
150,000
1,000,000
150,000
410,000
1,000,000
650,000
580,000
1,000,000
900,000
1,000,000
1,000,000
100,000
500,000
1,000,000
500,000
1,000,000
1,000,000
600,000
450,000
1,000,000
350,000
450,000
1,000,000
350,000
990,000
1,000,000
550,000
10,000
349,000
250,000
10,000
*284 The bank records of Talmud at Barclays Bank California show the following series of transfers to and from that account on December 9, 1975: From
To
Amount
WE
Talmud
$1,000,000
Talmud
Barclays BVI
1,000,000
WE
Talmud
1,000,000
Talmud
Barclays BVI
1,000,000
WE
Talmud
1,000,000
Talmud
Barclays BVI
1,000,000
WE
Talmud
1,000,000
Talmud
Barclays BVI
1,000,000
WE
Talmud
1,000,000
Talmud
Barclays BVI
1,000,000
WE
Talmud
1,000,000
Talmud
Barclays BVI
1,000,000
WE
Talmud
1,000,000
Talmud
Barclays BVI
1,000,000
WE
Talmud
1,000,000
Talmud
Barclays BVI
1,000,000
WE
Talmud
1,000,000
Talmud
Barclays BVI
1,000,000
WE
Talmud
1,000,000
Talmud
Barclays BVI
1,000,000
From prior to 1969 through at least 1976, employees in Mr. Harry Margolis' office would prepare "cash flow" or "money movement" charts. These charts would show where money was to go. The employee would also prepare an "authorization form" for each transfer of funds. Money would often go out of and come back into the same account on the same day. There was a box on the authorization form entitled "Circulating." When funds were to stay within the Margolis *285 "system" this box would be checked. The Margolis "system" consisted of entities both foreign and domestic which were in some way connected with Mr. Harry Margolis' office, either as clients or entities whose books were kept in his office and for which he could issue authorization forms to the bank for transfer of funds. In late 1973, Mr. Margolis met Gerald Schulman. At the time, Gerald Schulman was organizing limited partnerships to acquire properties which were occupied by a credit-worthy tenant on a long-term lease paying a sufficient rental for the loan on the property to be paid from rental receipts. Mr. Schulman considered such properties appropriate to be placed in a limited partnership to be formed by him. Mr. Schulman would acquire a contract to purchase the properties so that he could transfer them to a limited partnership. These properties were referred to by Mr. Schulman as "Post Office properties" since the tenants in many of the buildings that he acquired were United States Post Offices. One of the provisions of the Talmud partnership agreement which Mr. Schulman signed as a general partner was that any property suitable for syndication acquired by a partner in *286 that partnership must be offered to the partnership in writing at identical terms as the terms of acquisition by the partner. In addition to the formation of the Talmud partnership, Mr. Margolis also prepared and had signed similar partnership agreements for partnerships designated as Koran, Isis and Zen. The partnership agreement for each of these partnerships also provided that any property suitable for syndication acquired by a partner must be offered to the partnership at identical terms to the terms of its acquisition by the partner. An agreement was signed on behalf of each of these partnerships with WE identical to the financing agreement signed on behalf of WE and Talmud. Each of the agreements signed on behalf of WE and one of the partnerships of Koran, Isis or Zen contained identical terms to the agreement between Talmud and WE, that is, that a stated amount of money would be lent by the partnership to WE, interest-free, and that WE would pay to the partnership 1 percent of the cost of properties offered to it by the partnership and 5 percent of the cost if the property was accepted by it.Each of the agreements with the partnerships other than Talmud provided for making *287 available loans of a specified sum of money by WE for the partnership at an interest rate of 5 percent. Gerald Schulman is listed as a general partner in each of the Koran, Isis and Zen partnerships. Erich Meyer, Donald F. Cox, EST, ADC and P. Michael Hunt are listed as partners of Koran. P. Michael Hunt is listed as a partner of Isis. The following schedule shows properties acquired by Mr. Schulman, the acquisition price and the partnership or partnerships to which they were offered, together with the percentage offered to that partnership as contained in records in Mr. Harry Margolis' office: Location of
Purchase
Partnership
Percentage
Property
Price
to Which Offered
Offered
South Broadway,
Los Angeles, CA
$185,000.00
Talmud
100
Nevada City, CA
234,094.50
Talmud
100
Salt Lake City, Utah
403,000.00
Talmud
50
Salt Lake City, Utah
403,000.00
Koran 50
Henry, Illinois
164,500.00
Talmud
100
Fremont, CA
650,000.00
Talmud
50
Fremont, CA
650,000.00
Koran 50
Cambrian Park,
San Jose, CA
595,000.00
Talmud
33
Cambrian Park,
San Jose, CA
595,000.00
Koran 33
Cambrian Park,
San Jose, CA
595,000.00
Isis  33
*288 Talmud did not seek to enforce the provision of the partnership agreement giving it the exclusive right to properties acquired by any partner against Gerald Schulman. A partner of Talmud, on behalf of Talmud, signed documents designated as promissory notes in favor of ABL. These documents show the following numbers, dates, and amounts: Number
Date
Amount
915
12/5/74
$1,000,000
129
12/9/74
2,000,000
951
12/9/74
2,500,000
960
12/19/74
4,500,000
These documents recite that prepayment of 10 percent interest is required on the amount stated to be the loan. Documents stating the assignment of the above described notes, dated approximately 2 months after the date appearing on the notes, state that the notes are assigned to Barclays Bank Tortola without warranty on the part of ABL. The assignment of the notes to Barclays Bank Tortola was for the account of Wickhams Cay Trust Co. Noel Barton, as director of Wickhams Cay Trust Co., did not ask for or receive any information regarding the financial status of Talmud or any of its partners prior to the transfer of funds to ABL, purportedly under the later executed assignment of the notes without warranty. *289 In 1974 and 1975, Mr. Barton was a signator on the bank account of WE at Barclays Bank Tortola. There was prepared in the office of Mr. Harry Margolis a document entitled "Commission Schedule" for each Talmud, Koran, Isis and Zen partnership for the year 1974. According to this document each of these partnerships offered WE in the year 1974 properties having the following value: Partnership
Amount
Talmud
$2,401,333
Koran
2,044,833
Isis
1,448,083
Zen
1,270,000
According to the commission schedules prepared in the office of Mr. Harry Margolis, the following properties from the partnerships shown were accepted by WE under the terms of the agreement to purchase and finance properties during the period of 1975, ending November 30: Partnership
Amount
Talmud
$730,194.25
Koran
730,194.25
Isis
730,194.25
Zen
730,194.25
The agreement to purchase and finance properties between Talmud and WE, and also the agreement between Koran and WE, provided that WE would accept properties from each of these partnerships at a value of not less than the following amounts: Year
Amount
1975
$4,000,000
1976
5,000,000
1977
7,000,000
1978
9,000,000
*290 The agreement to purchase and finance properties between Isis and WE states that WE would accept properties from Isis suitable for syndication having a value of not less than the following amounts: Year
Amount
1975
$2,000,000
1976
4,000,000
1977
6,000,000
1978
8,000,000
There was no requirement in the agreement between Koran and WE, or Isis and WE, that WE accept any properties in 1974, but if it did, it was to pay the stated 5 percent commission. Also under the agreement, WE would pay 1 percent of the purchase price to each Isis and Koran for each property offered during the year 1974. In December 1975, documents were prepared and signed stating that Koran, Isis, Zen and Talmud were consolidated into a partnership entitled KIZT. According to the documents, each of the agreements to purchase and finance properties between each partnership and WE were incorporated into the consolidation. The documents provided that KIZT would lend to a Panamanian corporation, Parallax, an entity which was part of the Margolis system, interest-free for 1 year a specified sum of money, and Parallax was to take over the agreement between each of the partnerships going *291 into the consolidation of KIZT and WE with respect to financing properties. The escrow opened on November 26, 1974, by Gerald Schulman with respect to the South Broadway property in Los Angeles, California, showed the total sales price of the property to be $185,000 with a downpayment of $38,000 and an assumable first deed of trust with an unpaid balance in the amount of approximately $147,000 as of November 1974 at 5-1/2 percent interest per annum. This trust deed required annual payments of $16,220.04 until February 1987. The escrow substitution agreement dated December 6, 1974, between Gerald Schulman and Talmud states that Mr. Schulman assigned his rights in the escrow on the South Broadway property to Talmud. A document showing an assignment from Talmud to Convalescent Rehabilitation Center Services, Inc. (CRC), a California corporation of which Regina Leary, an attorney in Mr. Harry Margolis' law office from 1974 through 1976, was president, and Kenneth Reiserer, another attorney in Mr. Margolis' office, was assistant secretary and treasurer, of Talmud's rights in the escrow on the South Broadway property was dated December 6, 1974. Neither Mrs. Leary nor Mr. Reiserer received *292 a salary from CRC for acting as its officers. Mrs. Leary had no experience in corporate management before becoming president of CRC. Policy decisions for CRC were made in Mr. Margolis' office and during the time Mrs. Leary was president of CRC, the original books of entry of CRC were kept in Mr. Margolis' office. The agreement of limited partnership of South Broadway Limited (Post Office Partnership No. 1) dated December 31, 1974, states that the total capital contribution of the partners to Post Office Partnership No. 1 is $72,000. There is a document signed on behalf of Post Office Partnership No. 1 and CRC stating that it is a sales agreement between Post Office Partnership No. 1 and CRC. Under the statements in this document, Post Office Partnership No. 1 agrees to purchase a post office located at South Broadway in Los Angeles, California, for $289,000 cash. The document further states that CRC has arranged for long-term financing of the property in the amount of $289,000 from WE. The document further states that the financing required Post Office Partnership No. 1 to deposit $720,000 with WE in 1974 for 1 year interest-free. The document further states that CRC would *293 arrange for a 1-year loan from ABL to Post Office Partnership No. 1 in the amount of $720,000 for which Post Office Partnership No. 1 would pay ABL $72,000 in interest. There is a document entitled "Financing Agreement" between WE and Post Office Partnership No. 1 dated December 1974 and a document entitled "negotiable Promissory Note" in favor of WE from Post Office Partnership No. 1 dated December 6, 1974.The document entitled "Financing Agreement" stated that WE would lend $289,000 to Post Office Partnership No. 1 at an effective interest rate of approximately 5 percent over the terms of the loan and the document entitled "negotiable Promissory Note" was for the amount of $289,000. These documents state that from December 6, 1974 through December 1979, interest was to be computed at 5.63 percent per annum, and from January 1, 1980 through December 31, 1986, interest was to be computed at 4.2 percent per annum, and from January 1, 1987, all payments on the loan were to be applied to principal only until the loan was repaid. The annual payments under the loan were to be $16,260 from December 6, 1974, to January 1, 1987, and $16,900 thereafter. If all payments on the deed of trust *294 which was on the South Broadway post office property when it was acquired by Mr. Schulman had been timely made, the property would have been unencumbered by January 31, 1987, with a final payment of $6,540.90. If all payments under the agreement between CRC, WE and Post Office Partnership No. 1 were timely made, the property would be unencumbered on January 31, 2002. On December 9, 1974, Gerald Schulman opened an escrow on a post office property located in Nevada City, California. Under the terms of the escrow, the total purchase price of the property was $235,094.50, consisting of a downpayment of $58,000 and an assumable first deed of trust at 7.36 percent per annum with an unpaid balance as of December 1974 in the amount of $177,094.50. The deed of trust was payable over a 20-year period commencing January 1, 1973. Under the terms of the first deed of trust on the Nevada City post office property, if all payments were timely made, the property would be unencumbered by January 1, 1993. Payments on the Nevada City property under the assumed deed of trust were at $1,427.92 a month or $17,135.04 a year, with a final payment due December 31, 1992, of $25,350.04. A document entitled *295 "Escrow Substitution Agreement" between Mr. Schulman and Talmud dated December 24, 1974, states that Mr. Schulman transfers his rights in the escrow on the Nevada City post office property to Talmud. There is an assignment agreement dated December 6, 1974, from Talmud to CRC stating that Talmud assigned its rights in the escrow on the Nevada City post office property to CRC. A document entitled "Agreement of Limited Partnership" of Nevada City Limited (Post Office Partnership No. 2) dated December 31, 1974, states that the total capital contribution to Post Office Partnership No. 2 is $85,000. A document entitled "Post Office Sales Agreement" between CRC and Post Office Partnership No. 2 dated in December 1974 states that Post Office Partnership No. 2 is to purchase the post office property located at Nevada City, California, for $315,000 cash. The document further states that CRC has arranged for long-ters financing for Post Office Partnership No. 2 from WE in the amount of $315,000 and that the financing package requires Post Office Partnership No. 2 to deposit $790,000 with WE in 1974 for 1 year interest-free. The document further states that CRC would arrange for Post Office *296 Partnership No. 2 to borrow $790,000 from ABL for 1 year at 10 percent interest or $79,000. A document entitled "Financing Agreement" between WE and Post Office Partnership No. 2 dated in December 1974 recites that WE and Post Office Partnership No. 2 have an arrangement whereby WE would lend $315,000 to Post Office Partnership No. 2 at an effective interest rate of 5 percent. A promissory note to WE from Post Office Partnership No. 2 recites a loan of $315,000. These documents state that from December 1974 through December 31, 1979, payments were to be applied to interest on the loan computed at the rate of 5.44 percent per annum and from January 1, 1980 through December 31, 1981, payments were to be applied to interest on the loan computed at a rate of 4.5 percent per annum, remainder to principal. From January 1, 1992, payments were to be applied to principal only until the loan was repaid. Annual payments on the loan were to be $17,135 from December 1974 through December 31, 1992, and $25,000 per annum thereafter until the note was paid. If all payments under this agreement were timely made, the note would be repaid in the year 2003. On October 14, 1974, Gerald Schulman *297 opened an escrow on a post office property located in Salt Lake City, Utah. Escrow instructions were amended on December 18, 1974, and again on December 26, 1974. Under the terms of the escrow, the total purchase price of the property was to be $393,000, consisting of a downpayment of $68,000 and an assumable all-inclusive deed of trust with an unpaid balance in the approximate amount of $323,000 as of October 1974. The all-inclusive deed of trust bore interest at a rate of 7.77 percent per annum and required annual payments in the amount of $31,605. The term of the deed of trust was approximately 23 years and 1 month. The escrow instructions called for payments of brokerage by the purchaser in the amount of $10,000. Under the terms of the deed of trust, if all payments were timely made, the Salt Lake City post office property would have been unencumbered on April 30, 1995. A document entitled "Escrow Substitution Agreement" dated December 24, 1974, stated that Mr. Schulman transferred his rights in the escrow on the Salt Lake City post office property to Talmud and Koran. According to the escrow substitution agreement, each partnership received 50 percent of Mr. Schulman's *298 rights in the escrow. Documents entitled "Assignment" between Talmud and CRC and Koran and CRC dated December 6, 1974, stated that Talmud and Koran each transferred their rights in the escrow on the Salt Lake City property to CRC. A document entitled "Agreement of Limited Partnership" for the Salt Lake City property (Post Office Partnership No. 4) dated December 31, 1974, states that the total capital contribution to Post Office Partnership No. 4 is $130,000. A document entitled "Post Office Sales Agreement" between Post Office Partnership No. 4 and CRC states that Post Office Partnership No. 4 buys the Salt Lake City post office property from CRC for $520,000 cash. The agreement further states that CRC would arrange long-term financing for Post Office Partnership No. 4 from WE in the amount of $520,000. The document states that the financing package would require Post Office Partnership No. 4 to deposit $1,300,000 with WE in 1974 for 1 year interest-free. The agreement also states that CRC will arrange for Post Office Partnership No. 4 to borrow $1,300,000 from ABL for 1 year at 10 percent interest or $130,000. The document entitled "Financing Agreement" between Post Office *299 Partnership No. 4 and WE dated in December 1974 and a promissory note from Post Office Partnership No. 4 dated December 9, 1974, recites that WE would lend Post Office Partnership No. 4 $520,000 at an effective interest rate of 5 percent for approximately 30 years. These documents state that from December 1974 through December 31, 1979, payments were to be applied to interest computed at the rate of 6.08 percent and payments from January 1, 1980 through December 31, 1995 were to be applied to interest to be computed at an annual rate of 5 percent with the remaining amount being applied to principal. From January 1, 1996, payments were to be applied to principal only until the balance of the loan was paid off. Annual payments were to be $31,605 from December 9, 1974, until the loan was repaid.Under the agreement entitled "Financing Agreement" between WE and Post Office Partnership No. 4, if all payments were timely made the note would be paid off in full in the year 2008. On December 10, 1974, Gerald Schulman opened an escrow on a post office property located in Henry, Illinois. The escrow closed on June 6, 1975. Under the terms of the escrow, the total purchase price of the *300 property was to be $146,500 consisting of a downpayment of $29,300 and a deed of trust in the amount of $117,200 at a rate of 7 percent per annum requiring an annual payment of $10,850.14. Payments on the trust deed were to commence in April 1975 and continue for 15 years. Under the terms of the trust deed, if all payments were timely made, the Henry, Illinois, post office property would be unencumbered in 1990 with a final payment of $47,308.67 being made on March 1, 1990. A document entitled "Escrow Substitution Agreement" dated December 24, 1974, between Gerald Schulman and Talmud states that Mr. Schulman assigned his interest in the escrow on the Henry, Illinois, post office property to Talmud. A document dated December 6, 1974, entitled "Assignment" from Talmud to CRC states that Talmud assigns its interest in the escrow on the Henry, Illinois, post office property to CRC. An agreement of limited partnership of Henry Limited (Post Office Partnership No. 5) dated December 20, 1974, states that the total capital contribution of the partners to the Post Office Partnership No. 5 is $50,000. A sales agreement dated December 1974 from CRC to Post Office Partnership No. 5 states *301 that Post Office Partnership No. 5 is to purchase the Henry, Illinois, post office property from CRC for $194,000 cash. The agreement states that CRC would arrange for long-term financing of Post Office Partnership No. 5 from WE in the amount of $194,000 cash. It further states that Post Office Partnership No. 5 is to deposit $500,000 with WE in 1974 interest-free for 1 year, and that CRC would arrange for Post Office Partnership No. 5 to borrow $500,000 from ABL for 1 year at 10 percent interest or $50,000. As in the other instances, there is a financial agreement between Post Office Partnership No. 5 and WE providing for financing in the amount of $194,000 with an effective interest rate of 5 percent and a promissory note from Post Office Partnership No. 5 to WE providing for payment in approximately 20 years. These documents also provide for interest only payments of 5.59 percent to the end of 1979 and for payments of principal and interest from January 1, 1980 through December 31, 1989, at an effective annual rate of 4.5 percent and thereafter all payments to be applied to principal only. The annual payments called for were in the amount of $10,850 until 1990, and from January 1, 1990 through *302 December 31, 1994, annual payments were to be made in the amount of $14,838, and from January 1, 1995 through December 31, 1999, annual payments were to be made in the amount of $17,064. The loan was to be paid off with an annual payment of $19,624 in the year 2000. Arrangements comparable to the ones discussed above were made with respect to other properties acquired by Mr. Schulman in 1974 and properties acquired by him in 1975 and assigned to one of the partnerships consolidated into KIZT. In each instance the "financing" arranged by CRC was in excess of the original price of the property to Mr. Schulman and the sales price to the post office partnership was at the increased price. In each instance, the time necessary to have the property unencumbered was longer than the time required under the trust deed assumed by Mr. Schulman and the yearly sum to be paid was initially the same with a later increase. Respondent in his notice of deficiency to each of petitioners disallowed the claimed deduction for the claimed distributive share of the partnership loss from Talmud Properties Partnership in the year 1974. The distributive loss of Talmud resulted from an interest deduction *303 by Talmud on its partnership return of income which talmud claimed to have paid on a loan from ABL, the proceeds of which Talmud claimed were used to make a tax-free 1-year loan to WE. OPINION Petitioners in this case take the position that they have shown all of the necessary elements to establish that the $1 million claimed as an interest deduction by Talmud on its partnership return of income was a proper deduction and that therefore each of the partners of Talmud properly claimed his pro rata share of the loss occasioned by that deduction. Petitioners point out that although a taxpayer bears the burden of proof with respect to a claimed deduction, after that taxpayer has established a prima facie case the burden of going forward with the evidence shifts to respondent, citing Byrum v. Commissioner,58 T.C. 731, 735 (1972). Petitioners state that in order for an amount to be deductible as interest under section 163(a), it is necessary to show that the claimed payment was an interest payment, that it was paid or accrued in the taxable year in which it was deducted, and that the payment was made pursuant to a legally enforceable indebtedness which was the primary *304 obligation of the taxpayer. Petitioners state that they have established all of these elements with respect to the $1 million which Talmud claimed as an interest deduction. In support of this contention, petitioners point to the promissory notes signed by Talmud which recited that they required that interest be prepaid. They further point out that Talmud's books and canceled checks and bank statements show that the amount claimed to be deductible as interest was paid by Talmud to ABL. Petitioners rely on Stout v. Commissioner,273 F.2d 345, 351 (4th Cir. 1959), revg. and remanding a Memorandum Opinion of this Court, for their position that these book entries and documents establish their case. Petitioners particularly rely upon the statement in that case at page 351, that -- Book entries are not necessarily conclusive proof of the facts they represent. When made substantially contemporaneously with the events and long before any tax controversy arises, as these were, they are entitled to great weight. When the conduct of the parties is shown to be consistent with the book entries, there is no justifiable basis for findings in conflict with their disclosure. *305 At least, a contrary finding, on this record, cannot be said to rest upon substantial evidence. [Fn. ref. omitted.] Petitioners point to the formalities of the various transactions, namely that the notes recited the necessary elements for an enforceable promissory note and were signed by one of the partners of Talmud, and that the notes state the interest rate to be charged. Petitioners refer to the records of Talmud and its bank statements to establish that the proceeds of the indebtedness evidenced by the promissory notes were received by Talmud. They point to the form of the notes as satisfying enforceability under the laws of the State of California. They also rely on the notes to establish that the claimed indebtedness was an indebtedness of Talmud. From their analysis of the evidence, petitioners conclude that they have established a prima facie case for the interest deduction and that it is incumbent on respondent to go forward with evidence to show that the amount is not properly deductible as interest. Petitioners then argue that respondent has not met his burden of going forward with evidence to show that the transaction was not in substance what it purported to *306 be. They point out that suspicious circumstances may only be used as a cause to scrutinize a transaction and are not relevant in determining whether a transaction should be recognized for tax purposes. While claiming that these transactions were all at arm's length, petitioners argue that a transaction not at arm's length is merely an indication that it may be appropriate to scrutinize the transaction and does not in and of itself cause the transaction not to be one of substance. The further argument of petitioners deals primarily with their contention that the evidence produced by the Government at most creates a suspicion which does not overcome the prima facie case established by petitioners. Petitioners contend that a taxpayer's motive is irrelevant in determining whether a transaction should be recognized for tax purposes and that a series of transactions, rather than a single transaction, is of no consequence in determining whether a transaction should be recognized for tax purposes. Petitioners argue that there is no merit to respondent's claim that the various transactions were shams and argue that there was economic substance to the various transactions involved in *307 this case. Petitioners point out that had Talmud offered to WE, and WE accepted, all the properties that Talmud was entitled to offer and obtained a commission on such offering of $30 million, that there was a potential for a $500,000 profit to Talmud after the $1 million interest deduction was taken. Petitioners also argue that Talmud was exposed to risks beyond its control and for this reason the transactions should be held to have substance and not be mere sham. Respondent recognizes that the issue in this case is the deductibility by Talmud of the $1 million it claims as an interest deduction and argues that before petitioners can claim their distributive share of the losses of Talmud occasioned by this deduction, they must show that Talmud was entitled to claim this deduction and a resulting loss at a partnership level. Respondent argues that petitioners are not entitled to deduct distributive losses from Talmud because the transaction creating those losses for Talmud was a sham. In support of this argument, respondent states that Mr. Harry Margolis' office controlled all of the entities involved in the transactions in this case and that the alleged loan by ABL to Talmud *308 did not create a bona fide indebtedness upon which an interest deduction could be claimed. Respondent further argues that the alleged loan from ABL to Talmud was s sham because there was no substance to the transaction for which the alleged loan was made. Respondent states that there is gross discrepancy between the economic benefits supposedly flowing from the purported indebtedness and the purported indebtedness itself, and for this reason the form of the transaction does not reflect its substance. As is readily apparent, the decision in this case turns on weighing all the evidence in the record. [3] Upon an analysis of the record as a whole, we conclude that there did not in substance exist an indebtedness from Talmud to ABL and that there was no interest payment by Talmud to ABL. Not all of the documents, even on their face, support petitioners' position, although this is not the basis for our conclusion. One decument that is supposedly an assignment of the notes from Talmud to ABL to Barclays Bank Tortola, without warranty, was not executed until 2 months after the notes were supposed to have been discounted to Barclays Bank Tortola to enable ABL to have funds to advance *309 to Talmud. Also, the so-called financing agreement between Talmud and WE, which was the crux of petitionersh argument that there was some substance to the transactions, was not signed by Donald F. Cox on behalf of Talmud until 1976. However, much more important to our conclusion than these failures to comply with the form in which the transaction was purported to be established is the evidence in the record leading to the conclusion that all the transactions between Talmud, WE and ABL lacked substance. The record shows that at least $400,000 of the purported payment by the stated partners of Talmud to the partnership wad advanced to the partners *310 by ABL and returned by the partners to ABL as an interest payment. The record does not show the source of the remaining $600,000 purportedly paid into Talmud by its partners and paid over to ABL. The record clearly shows that no $10 million was advanced by Talmud to WE. The record shows merely a circular transfer of funds from ABL to Talmud, to WE, to Barclays Bank Tortola, back to ABL. Transfers from ABL to Talmud of amounts ranging from $500,000 to $1 million were made with the immediate transfer through bank accounts over which the law offices of Mr. Harry Margolis had control of the same amounts to WE and almost simultaneously a transfer from a bank account at Barclays Bank Tortola back to ABL. The record is not conclusive from what source the funds transferred from the Barclays Bank account at Tortola to ABL came. However, there is a reasonable inference from the record that these funds came from WE. The record shows that most funds obtained by ABL came from WE, and that the purported purchaser of the notes of ABL, Wickhams Cay Trust Co., had no substantial funds of its own and that its director had a signatory right on WE's account. There is a reasonable inference in *311 the record that Mr. Harry Margolis could direct transfers from WE's accounts to bank accounts at Barclays Bank California. In fact, a witness for respondent, a Mrs. Vanderberg who had worked in the office of a Mr. Smeets as an employee of Curacao International Trust Co. (ABC) in the Netherlands Antilles from 1964 through 1966 and from 1968 through 1971, stated that she was aware that Mr. Margolis did direct transfers of funds to and from WE and other foreign entities. Employees of Mr. Margolis' office who handled the cash flow charts testified that it was very common to have cash flow charts prepared at the direction of Mr. Harry Margolis' office to transfer funds from a domestic entity to a foreign entity and back to the domestic entity, sometimes going through other foreign or domestic entities, in the same day. Employees of Mr. Margolis' office identified WE, Wickhams Cay Trust Co., CRC, EST, ABL and Talmud, as well as various other entities, as entities referred to in Mr. Margolis' office as "system entities." Apparently the "system entities" were ones over which Mr. Margolis had some rights to transfer funds to various bank accounts. From the evidence as a whole, we conclude *312 that there was in fact no loan of $10 million from ABL to Talmud or the placing of $10 million by Talmud with WE, but rather merely a circular transfer of funds that originated with WE and were returned to WE, and that the purported return of the $10 million by WE to Talmud was a mere reversal of the circular transfer of funds. Certainly, there has been no reason shown for the various transfers on the same day, and the testimony in the record is that these various transfers might well be a circulation of the same funds a number of times. Although not specifically so stated, Mr. Margolis in his testimony effectively admitted that there was a circularization of funds here. He stated something to the effect that by circulating one penny often enough, he could retire the National debt. In Karme v. Commissioner,73 T.C. 1163, 1186 (1980), affd. 673 F.2d 1062 (9th Cir. 1982), we held that a circularization of funds such as transpired in the instant case did not in substance create an indebtedness but was effectively a sham transaction. The recent case of Goldberg v. United States,789 F.2d 1341 (9th Cir. 1986), *313 reaches a similar result. [4]
There are many other indications of sham in this record. If in fact Talmud had been established as a legitimate profit-making partnership, it would have required Mr. Schulman to transfer to it and give it the opportunity to finance any post office properties he acquired. However, the record shows that Talmud made no objections to the transfer of properties by Mr. Schulman to the other partnerships. This fact clearly demonstrates that Talmud was not in fact operated for a business purpose. The record also shows that there was no reason as far as Mr. Schulman and the post office partnerships were concerned for the financing which *314 Talmud contends it was to obtain from WE for the deposit, interest-free, of the $10 million. With respect to each of these properties, the post office partnerships would have been better off financially to have kept the financing which existed on the properties when Mr. Schulman acquired them by assumption of the existing deeds of trust. It is therefore clear that the reason for the refinancing did not have to do with the best interest of the post office partnerships. Furthermore, the documents signed by WE and Talmud recited an amount to be lent to Talmud on properties offered by Talmud and accepted by WE far in excess of any amounts that were actually offered. The interest-free money stated to be put up by Talmud under the agreement was to compensate for the low interest loans according to petitioners' contention. However, the record shows that each of the post office partnerships was also required to put up, according to the documents signed, interest-free funds with WE or Parallex after Parallex took over, according to petitioners' contention, the agreement of WE. There is no explanation of why this placement of funds by the post office partnerships was required. The record *315 also lacks an explanation of why, with Talmud having the amount available from WE which the agreement stated it had, there was any reason for the formation of Koran, Isis and Zen, each of which also under a document entitled "Agreement" put up money with WE for a year, interest-free. The formation of these partnerships with Mr. Schulman a partner in each and some other Talmud partners also partners, reduced Talmud's likelihood of procuring properties to be offered for financing to WE. The record as a whole clearly indicates that there was no substance to the formation or operation of Talmud. Forms were gone through, not always timely, to give the appearance of a business operation, but when all the facts in the record are considered, it is clear that this was merely a sham to obtain tax advantages and the avoidance of tax by clients of Mr. Harry Margolis. Petitioners make the argument that the lack of complete bank records of all foreign transactions requires the Court to conclude that respondent has not made a sufficient showing to overcome what petitioners state is their prima facie case. The record in this case shows that the choice of petitioners was to deal with foreign entities, *316 and respondent made many unsuccessful efforts to obtain records from the foreign entities prior to the conclusion of the trial in this case. Petitioners offered testimony from a number of witnesses to the general effect that they were unable also to obtain records from the foreign entities. Considering the relationship shown between the managers of the foreign entities and Mr. Harry Margolis, who structured the transactions here involved for petitioners, we are persuaded that personal efforts by Mr. Margolis to have obtained records from the foreign entities might have resulted in those records being forthcoming. However, it was the taxpayers' choice to deal with foreign entities, thus attempting to put beyond the reach of respondent certain documents. In our view, the absence of these documents should not require us to conclude that respondent failed in his burden of going forward with evidence by not producing these documents where, in any event, the circumstantial evidence produced by respondent is reasonably clear that the documents, if available, would support his position. [5]
*317 Based on the record as a whole, we conclude that Talmud did not borrow $10 million from ABL, did not in substance make an interest payment of $1 million to ABL and did not place $10 million interest-free with WE, but that all of the forms of papers signed purporting to show such transactions were shams executed solely for the purpose of obtaining tax deductions for petitioners. This case is before the Court on the severed issue of whether each petitioner is entitled to deduct his pro rata share of losses reported by Talmud on its partnership return of income for the year 1974. We have decided this issue for respondent. Since it is not clear from the record whether other issues will require these cases to be further litigated, Decisions will be entered under Rule 155 in those cases which have no other pending issues, and any other cases will be restored to the general docket.
Footnotes
1. The case of P. Michael Hunt and Sherry L. Hunt v. Commissioner, docket No. 13386-80, was originally consolidated with these cases, but all issues in the Hunt↩ case have been settled.
2. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue.↩
3. The trial record in this case contained over 2,700 pages of transcript of testimony and over 1,000 exhibits, many of which are lengthy documents. We have not attempted in our findings to summarize all this evidence, but have stated the facts we consider relevant to the issue herein and to an understanding of our decision. We have found the facts as stipulated. Since many of the exhibits are stipulated, they are part of our findings. However, we have not recited the contents of many of these numerous exhibits in our findings.↩
4. By letter dated July 17, 1986, petitioners' counsel directed the Court's attention to the opinion of the United States District Court, Northern District of California, in the case of United States v. Harry Margolis,↩ No. CR-85-2086-RPA. The District Court in that case concluded with respect to a criminal action that "as a matter of law, there is nothing illegal per se about sequential circular money transfers." We have considered the opinion of the District Court, and it does not change our conclusion in this case.
5. Subsequent to the trial of this case and after briefs were filed, numerous documents which had been unavailable became available to counsel for respondent and counsel for petitioners. These documents were obtained in connection with other litigation. Because of the lengthy controversy over the ability of petitioners to obtain these documents and the efforts respondent made to obtain them, the Court reopened the record in this case to receive any of these foreign documents which the parties could agree were authentic. After many extensions of time, the Government filed a document attaching copies of certain records, stating that respondent and petitioners had been unable to agree to stipulate these documents. Approximately at the same time this document was filed, petitioners' counsel filed a statement that no agreement to stipulate into the record further documents would be entered into on behalf of petitioners. The Court therefore did not review or consider the documents submitted by respondent since to have received the documents, absent agreement, would have required further oral testimony. After the last extension of time for filing a stipulation, which was at petitioners' request, the Court received from respondent a report stating the counsel for respondent had been informed by counsel for petitioners that no foreign documents would be agreed to on behalf of petitioners and that petitioners did not intend to submit any of the foreign records for receipt by the Court. Having received no response from petitioners to the order of the Court allowing the parties until February 14, 1986, in which to submit foreign records, the Court in February 26, 1986, entered an order closing the trial record in this case. On May 1, 1986, counsel for petitioners filed a document entitled "Motion to Reopen Record" in which the background of the foreign records becoming available was recited and in which petitioners represented that they did not have the wherewithall to review the foreign documents nor were they certain that all documents could be located which would be relevant to the case because the years to which the relevant documents related were 1974 and 1975. Petitioners requested that the record be reopened for petitioners to introduce testimonial evidence to explain and clarify the documents respondent had offered to the Court which had not been received by the Court in evidence and "that the record be reopened for the taking of testimonial evidence from witnesses by respondent." This motion was denied. From certain statements contained therein, particularly the statement suggesting that petitioners did not intend to review the records or to offer in evidence any of the documents which were now available, it appeared that any further hearing would serve no useful purpose. None of the documents submitted by respondent have been reviewed or considered by the Court and the Court's conclusion in this case is based on the trial record as made and the fair inferences to be drawn therefrom. However, again the Court emphasizes that when taxpayers deal with foreign entities, attempting to make documentation of their transactions unavailable to respondent, the argument that respondent has failed to produce documents conclusive as to certain facts as distinguished from evidence giving a clear inference that those facts are true, does not, as petitioners contend, warrant a holding for petitioners.↩